Dennis C. MADDUX, Plaintiff–Appellee,

v.

CARGILL, INC., Defendant–Appellant.

Court of Appeals of Tennessee,
Western Section,
at Knoxville.

May 12, 1989.

Application for Permission to Appeal
Denied by Supreme Court
July 31, 1989.

Charles G. Taylor, III, Knoxville, for plaintiff-appellee.

David W. Noblit, Chattanooga, for defendant-appellant.

CRAWFORD, Judge.

Defendant, Cargill, Incorporated, appeals from the judgment of the trial court on a jury verdict awarding plaintiff, Dennis Maddux, $5,359.32 compensatory damages and $25,000.00 punitive damages.

Plaintiff's complaint alleges that on or about January 24, 1983, plaintiff entered into a contract with Commodity Credit Corporation (CCC), an agency of the U.S. Department of Agriculture (USDA), whereby he agreed to withhold 166.5 acres of his farm land from production and in return the CCC agreed to make available to him as payment in kind 10,128 bushels of USDA No. 2 grade yellow corn. The complaint avers that in the fall of 1983 plaintiff was notified by the CCC that the corn he was to receive as payment in kind was stored by Cargill at its Hamilton County warehouse, and he was to receive the corn at that location. The complaint alleges that in February of 1984, plaintiff made a number of trips to Cargill's warehouse and received corn which was certified by the defendant as No. 2 grade corn, but was in fact of inferior quality. Plaintiff alleges that defendant willfully and fraudulently substituted a grade of inferior quality corn, although representing to plaintiff that he was receiving the No. 2 grade corn. He alleges that he went to Cargill's warehouse for the first load of corn and was told that before he could get any of the corn he must sign the receipt on the entitlement form, although the receipt provides for a signature after the commodity is received. He alleges that when he objected to signing the form prior to delivery, he was told that if he did not do so he could not get any corn and was further told that he would receive No. 2 yellow corn if he signed the receipt. A number of weeks later, after receiving the last load of corn, plaintiff received a copy of the entitlement form which indicated that defendant had inserted the date of February 29, 1984, as the date the receipt was signed, thus in effect certifying that plaintiff had received the quantity and quality of corn to which he was entitled. The complaint further alleges that when Maddux made a complaint with the USDA concerning the inferior grade corn his claim was denied because he had certified that he had received the quality and quantity of corn to which he was entitled. Plaintiff avers that the acts of Cargill constituted fraudulent misrepresentation, false pretenses, breach of trust and common law forgery.

Cargill's answer joins issue on the material allegations of the complaint and further relies upon the receipt signed by Maddux that he had received the correct quantity and quality of the commodity.

The material facts are virtually undisputed. Plaintiff Maddux is a farmer in Crossville who enrolled in the USDA Payment-in-Kind (PIK) program. In the contract between Maddux and CCC, Maddux agreed to set aside from production 166.5 acres of farm land in return for 10,128 bushels of USDA No. 2 grade yellow corn. Later Maddux received a PIK entitlement certificate authorizing him to begin receiving his corn designated as No. 2 grade yellow corn at Cargill's warehouse between October 1, 1983, and February 29, 1984. According to Maddux, before he went to Chattanooga to pick up the corn, he reached an agreement with the Farmers Co-op in Crossville to sell all 10,128 bushels of his corn for $3.90 a bushel.

On February 8, 1984, Maddux made his first trip to Cargill to receive his corn. After arriving at the warehouse, he talked to a Cargill employee who asked for his PIK entitlement certificate and asked Maddux to sign the certificate under the paragraph that stated, "I certify that I received the quantity and quality of the commodities shown above." Maddux testified that he protested the requirement that he certify that he had received the corn when he had not received it, but was told that unless he first signed the certificate, he would receive no corn. He testified that he asked for assurances that he would receive No. 2 grade yellow corn and when he was told that he would, he signed the certificate and left it with Cargill undated.

Plaintiff testified that when he backed his truck into position and began receiving his first load of corn, it appeared to him

that it was not USDA No. 2 grade yellow corn, so he took a sample to a grain inspection station in Chattanooga to have it tested. The test revealed that Maddux had actually received No. 5 grade corn, a much inferior grade. Maddux then returned to Cargill and talked with Cargill employee, James Reimer. According to Maddux, Reimer told him that since he had left the premises he must accept the corn, so Maddux returned to Crossville. When Maddux returned to Crossville, he contacted the USDA, but was told that he was to settle any quantity or quality differences with Cargill.

On February 13, 1984, Maddux returned to Cargill for another load of corn. After Cargill loaded the corn on plaintiff's truck, plaintiff drew a sample and took it to the grain inspection station in Chattanooga, this time leaving the load of corn at Cargill. It was determined by the inspection that the corn was not No. 2 grade corn. Maddux then returned to Cargill and was referred to Wayne Shirk, a senior grain merchant at Cargill. Maddux testified that he asked Shirk to give him No. 2 grade corn and that Shirk advised him that he could dump the load and try another load from Cargill's bin. Maddux dumped the load, but because he was dissatisfied with the corn, he left without another load. Again, once Maddux got home he contacted the Agricultural Stabilization and Conservation Service, a USDA agency, to complain about Cargill, but could get no help.

With the deadline for receiving his PIK entitlement nearing, Maddux returned to Cargill on February 23, 1984, and from that time until March 14th, Maddux made 13 trips to defendant's warehouse to pick up his corn. According to Maddux, after picking up each of these loads, he then went to the grain inspection station to have the corn tested. None of the additional 13 loads tested was No. 2 grade corn. Most of the loads tested were No. 5 grade corn, although one load did not even meet the requirements of No. 5 grade corn and was designated simply as sample grade.

A few days after picking up his last load of corn in March of 1984, Maddux received in the mail a copy of his PIK entitlement certificate which he had previously signed and left with Cargill when he picked up his first load of corn. The copy of the certificate showed that Cargill had signed a certification dated February 29, 1984, that it had delivered the quantity and quality of the commodity shown on the certificate. Also, the certificate showed a date of February 29, 1984, for the signature of Maddux certifying that he had received delivery of the corn required by the certificate. Ann O'Mary, the signatory on the certificate for Cargill, testified that she signed the certifications for Cargill and placed the date thereon for Maddux's signature. She stated that this was a routine duty, and she signed and dated the certifications without any further verification that the farmer had actually received the quantity and quality of corn required.

Shortly after Maddux received his copy of the PIK entitlement certificate, he began filing appeals with the USDA and went through various steps in the appeal process, but was notified by letter of June 15, 1984, that since he had certified on February 29, 1984, that he had received the proper quality and quantity of the commodity, the Department could not be responsible for the deficiency in quality. The letter stated in part:

> ... Mr. Maddux did not question the quality of the corn until after he had accepted delivery of it and signed his PIK entitlements. In view of this, CCC cannot be responsible for any deficiencies in quality because Mr. Maddux has certified that he received the proper quality and quantity.

Richard Kelly, an official with the USDA was called as a witness on behalf of Cargill. He testified that Maddux's appeal with the USDA was denied because of the February 29, 1984, certification by Maddux on the PIK entitlement certificate that he had received all of the grain according to the certificate. He stated that the use of the certificate contemplated that the farmer was to receive the grain and then certify that he had received all the grain and further that Cargill was to certify that the

grain was delivered only after actual delivery.

The contract documents between CCC and Cargill and the contract between Maddux and CCC provide that quality or quantity differences are to be settled between the warehouseman, Cargill, and the producer, Maddux. Kelly's testimony confirmed this fact.

A copy of the PIK entitlement form issued to Maddux is attached as an addendum to this opinion. The form expressly states on the face thereof as to the commodity, quantity and quality: "If quality is different from base grade ... No. 2 yellow corn ... quantity has been adjusted to compensate for the difference." Cargill's employee, Shirk, stated that Cargill attempted to settle the difference in quality with Maddux, but they disagreed on the amount of the difference. Shirk stated that Cargill was willing to pay Maddux one to two cents a bushel for the difference in grade, but was not willing to pay the 55 cents per bushel difference as demanded by Maddux.

Cargill's first issue for review is whether the trial court erred in denying its motion for directed verdict made at the conclusion of all the proof.

Cargill argues that Maddux claims two acts of alleged fraud, and that he failed to prove the essential elements of an action for fraud in both instances. First, Cargill asserts that Maddux's allegation that Cargill misrepresented the quality of corn that he was to receive cannot form the basis of an action of fraud because Maddux knew that he was getting an inferior quality of corn, he negotiated with Cargill employees for monetary adjustment due to the lesser quality, and that he did not attempt to rescind the transaction or attempt to withdraw the PIK certificate. Cargill argues that the second instance of alleged fraud is that Maddux was required to sign the PIK certificate prior to delivery of the corn, and that subsequently Cargill inserted the wrong date for certification, thus causing Maddux to lose his appeal rights to the USDA. Cargill asserts that Maddux failed to prove that he sustained any damages by virtue of his inability to pursue an administrative appeal.

There is proof in the record that Maddux was induced to sign the PIK entitlement certificate prior to delivery of the corn in reliance upon representations of Cargill's employees that he would receive No. 2 yellow corn. There is further proof in the record that he did not receive No. 2 yellow corn, that he protested repeatedly concerning the delivery of inferior grade corn, and attempted to settle his differences with Cargill, but was unable to do so. The record also shows that Cargill, notwithstanding its knowledge of the dispute over the quality with Maddux, certified that it delivered the quality and quantity of corn required and further completed the receipt signed by Maddux to show a date subsequent to actual delivery of the corn. The record further shows that the completion of the certificate of entitlement in this manner by Cargill was a falsification of facts and the receipt on the certificate was the basis for the USDA's denial of Maddux's appeal process. In previous complaints, however, made by Maddux to the USDA, he was informed that the differences concerning quality and quantity of the commodity received from Cargill must be settled between Cargill and Maddux.

The rule for determining a motion for directed verdict requires the trial judge and the appellate courts to look to all of the evidence, take the strongest legitimate view of the evidence in favor of the opponent of the motion, and allow all reasonable inferences from it in his favor. The court must discard all countervailing evidence, and if there is then any dispute as to any material, determinative evidence or any doubt as to the conclusions to be drawn from the whole evidence, the motion must be denied. *Tennessee Farmers Mutual Ins. Co. v. Hinson*, 651 S.W.2d 235 (Tenn. App.1983).

Generally in an action for fraud, there must be proof of a false representation of an existing or past material fact. The false representation must have been made knowingly without belief in its truth or recklessly. Some person must have rea-

sonably relied on it and suffered some damage as a result of the reliance. *Pusser v. Gordon,* 684 S.W.2d 639 (Tenn.App.1984). Fraud involves deception and if one knows the truth, and is not deceived, he is not defrauded. *Freeman v. Citizens' Nat'l Bank,* 167 Tenn. 399, 70 S.W.2d 25 (1934).

In *Brungard v. Caprice Records, Inc.,* 608 S.W.2d 585 (Tenn.App.1980), this Court noted the possible adoption by our Supreme Court of the majority rule allowing actions for promissory fraud. The Court said:

... Tennessee has long held the minority view that an action for fraud will not lie for representations or promises that something will be done in the future, even though the promise was made without the present intention to keep it. *A. Landreth Co. v. Schevenel,* 102 Tenn. 486, 52 S.W. 148 (1899). Recent cases, however, indicate that this view is giving way to the majority rule recognizing an action for promissory fraud. In *Bolan v. Caballero,* 220 Tenn. 318, 417 S.W.2d 538 (1967), the court upheld the old Tennessee rule, but indicated that it would consider the majority rule "in a proper case where justice demands...." *Id.* at 326, 417 S.W.2d 538. It is perhaps significant that in *Bolan,* the court found that no fraudulent promises had been made.

The current Supreme Court in *Fowler v. Happy Goodman Family,* 575 S.W.2d 496 (1978), recognized the trend towards the majority rule and went on to judge the facts before it according to this rule. The court held, however, that the party alleging promissory fraud had failed to produce sufficient evidence to support its claim. As a result, the court had no opportunity to explicitly adopt the majority rule.

It is apparent from these cases that the Tennessee Supreme Court will adopt the majority rule if the party alleging promissory fraud produces evidence supporting the allegation. The evidence in the instant case supports such an allegation. Plaintiff's recovery therefore can be predicated on misrepresentation of a material existing fact and on misrepresentation of intention or promissory fraud. 608 S.W.2d at 590.

In *Farmers & Merchants Bank v. Petty,* 664 S.W.2d 77 (Tenn.App.1983), the Court said:

Under the majority view, in order for actionable fraud to be based upon a promise of future conduct, it must be established that such a promise or representation was made with the intent not to perform. A statement of intention must be false and the intention not actually held. See Prosser, Law of Torts § 109 at 728–730 (4th ed. 1971); Restatement (Second) of Torts § 530 (1977); Annot., 51 A.L.R. 46 (1927) 68 A.L.R. 635 (1930); 91 A.L.R. 1295 (1934); 125 A.L.R. 879 (1940).

*Id.* at 80.

 In the instant case, Maddux argues that at the time he signed the receipt on the PIK entitlement certificate he relied upon the representation of Cargill that he would receive No. 2 yellow corn. From our review of the record, we cannot find any proof of an intention, at the time Maddux signed the certificate, on the part of Cargill not to perform as stated. Moreover, the evidence of subsequent events fortifies our conclusion. The corn was readily available for inspection upon delivery, and Maddux was offered on at least one occasion the opportunity to dump the corn he was dissatisfied with and receive another load. In addition, it appears that it was contemplated that there may be differences in quality. The proof appears uncontroverted that under the contract documents and USDA policy, adjustments necessary because of quality differences are to be made between the warehouseman, Cargill, and the producer, Maddux. In this case, the parties were unable to agree on a resolution of their dispute as to the difference in value of the corn that was actually received and that which should have been received. Thus, under USDA policy and the contract document, the only relief Maddux could have received from the USDA was the instruction that the parties must settle their differences concerning the value of the

corn. The insertion by Cargill of the final receipt date did not alter or affect the relief available.

From the record before us, we do not find evidence of actionable fraud and the trial court should have directed a verdict for defendant on the issue of punitive damages. As to the compensatory damages, although Maddux's complaint is grounded on fraud, the proof established an agreement between Cargill and CCC that Maddux was entitled to No. 2 grade corn and that Cargill was obligated to deliver to Maddux No. 2 grade corn. The proof further establishes that this agreement was breached, and this fact is not disputed.

In view of our decision on the first issue, there is no need to consider the second and third issues presented by Cargill. Defendant's last two issues concern the evidence introduced to prove the damages sustained by Maddux. We quote issue four from Cargill's brief:

4. This court erred in allowing Maddux to testify regarding his opinion as to the fair market value of No. 2 yellow corn in Crossville, Tennessee and by allowing Maddux to present John Teeple as a witness on the valuation of corn in Crossville, Tennessee.

Cargill argues that the trial court erred in allowing Maddux to testify as to his opinion of the fair market value of No. 2 corn in Crossville. We disagree with defendant's assertion. The only testimony pointed out by defendant as to plaintiff's "opinion" is that Maddux testified that he had an agreement with the Cumberland Farmers' Co-op in Crossville to sell his PIK corn for $3.90 a bushel. By itself, as defendant argues, this testimony would not be relevant as to plaintiff's damages. However, Maddux's testimony is corroborated by John Teeple, manager of the Farmers Co-op in Crossville, who testified (1) he had an agreement with Maddux to buy his corn for $3.90 a bushel; (2) the market price in Crossville is based in large part on the market price of Chattanooga; and (3) during the period in question the price of No. 2 corn in Chattanooga was essentially the same as it was in Crossville "within a nickle or dime either way, more or less."

Maddux was allowed to give his opinion that the value of the corn he received from Cargill was between $3.40 and $3.45 a bushel. We find no error in allowing this testimony. Generally, a plaintiff may testify as to the value of his own personal property, even though he does not qualify as an expert on the market value of such personal property. *Crook v. Mid–South Transfer & Storage Co.*, 499 S.W.2d 255 (Tenn.App.1973). Furthermore, the record reflects other proof in the record from one of Cargill's witnesses that established the market price in Chattanooga as in the same range.

Cargill next contends that the trial court erred in allowing Teeple to testify regarding his intention to buy an unspecified grade of corn at a specific price and at a location other than Chattanooga. If this assertion was true, we might agree; however, Teeple testified that during the period in question (February 8, 1984–March 14, 1988), the price he set in Crossville was $3.90 bushel which price is again based on the price of No. 2 corn in Chattanooga "within a nickle or dime either way, more or less." Certainly, Teeple's testimony is probative on the issue of proving damages and his testimony as well as Maddux's testimony on this issue was properly admitted to be given such weight, faith and credit as the jury may determine. This assertion is without merit.

The last issue presented by Cargill is: The court erred in failing to allow Cargill to present evidence of custom and usage in the trade with regard to dealing in corn as a commodity.

Cargill contends that the trial court erred in not allowing it to introduce evidence of custom and usage of discounting corn among grain elevator companies when the corn bought or sold is inferior to No. 2 grade corn or base grade. Cargill's complaint in this respect is that one of its witnesses, Mike Bohleber, an employee of Central Soya, another grain warehouse, was unable to testify that the discounting

of commodities is a common practice among grain warehousemen and contemplated by the PIK program. The exchange between the court and counsel for both parties is enlightening on this subject:

THE COURT: All right, on value. Now, on value. Then once you establish value for No. 2 yellow corn as to whatever your witness [Cargill] says it was—he may or may not agree with Mr. Taylor's [Maddux's attorney] witness—then if you want to ask him to establish that it would have a lower value or that he would owe that producer [Maddux] more money if that corn that the producer actually picked up was not No. 2 yellow corn and he says okay, since it wasn't No. 2 yellow corn and that's what he had come to get, once we—here again, you're talking about making the adjustment we would give him X number of dollars for No. 4 grade corn or No. 5 grade corn. Do you follow me? Am I making myself clear?

MR. TAYLOR: Your Honor, I think—

MR. NOBLIT: Yes, I understand what you're saying, but what I don't understand is why we're going through a— why we would go through a—when what they call it is—when the whole PIK Program contemplated and called for adjustments and adjustments are made on discounts, why can't we present that.

THE COURT: All right. For this reason: As I understood Mr. Kelley's [of the USDA] testimony—and this is my reason for not allowing it—there would be an implication there that this producer [Maddux] is going to be bound by the adjustment or the discount that that warehouseman [Cargill] says I'll give you and that's the end of the road, and that's not. I don't think that's what was intended in this program and I—I'm even more sure of that after Mr. Kelley's testimony. He says if that producer didn't want to take it at that discount rate, he didn't have to. That's an argument between the warehouseman and the producer and obviously it wasn't resolved in this case and that's why we're in here today.

MR. NOBLIT: That's where we are. That's right.

THE COURT: Right.

MR. NOBLIT: But the valuation of corn is based upon discount scales.

MR. TAYLOR: I think I am entitled, Your Honor, under the law that if he's going to put on any proof as to the value of corn he's got to comply with the law that says he's going to ask them what was the fair market value assuing a willing buyer and willing seller and that's the only way you can ask the question.

THE COURT: I agree.

\* \* \* \* \* \*

THE COURT: [A]gain, I'm not going to let you refer to what is customary in the trade as between warehousemen. I am going to let you go into it with this witness and go ahead and I guess the only practical way to let you get in the proof that I think you're entitled to with regard to adjusting the price as relates to the different grades of corn is to use the word adjustment or discount or whatever it's been referred to so much already. I don't guess it's going to make that much difference now.

But I'm not going to let you ask him what's customary or the custom in the trade as between them [Central Soya, Boheleber's employer] and their other customer or their warehousemen. You can ask him about the differentiation in the price because I think Mr. Taylor can either clear that up or can make his point through cross-examination, Mr. Taylor—

■ The custom of business or the course and conduct of a business may be relevant and material in a claim arising out of such a business, but such evidence is not looked upon favorably by the law, and to be admissible, the relevancy and probative value of the proffered evidence must clearly appear. *Middle Tennessee Elec. Membership Corp. v. Barrett*, 56 Tenn.App. 660, 410 S.W.2d 914 (1966).

■ We note that the record reveals that defendant was allowed to present testimony reflecting the majority of the facts it desired to present. Furthermore, defen-

dant has not suggested nor does the record reflect that defendant made an offer of proof of the excluded testimony. *See Austin v. City of Memphis,* 684 S.W.2d 624 (Tenn.App.1984). We think the trial judge properly exercised his discretion in excluding the evidence. In any event, in view of the evidence introduced by defendant, the exclusion of the testimony it apparently desired from this witness is harmless error. T.R.A.P. 36(b).

In summary, there is material evidence in the record that the difference in value of what Maddux received and what he should have received is $5,359.32, the amount of compensatory damages awarded. As not-ed, there is no material evidence to support an award of punitive damages. Accordingly, the judgment of the trial court denying defendant's motion for directed verdict as to punitive damages is reversed and judgment is entered for defendant on the issue of punitive damages. The judgment of the trial court as to compensatory damages is affirmed, and this case is remanded to the trial court for such further proceedings as may be necessary. Costs of the appeal are assessed equally against both parties.

TOMLIN, P.J. (W.S.), and FARMER, J., concur.

CCC-47-1
(3-14-83)

**U.S. DEPARTMENT OF AGRICULTURE**
Agricultural Stabilization and Conservation Service
Commodity Credit Corporation

**PIK ENTITLEMENT**

Earliest date
for redemption: 10-1-83

*M3*

**TO:** *(Producer's Name and Address)*

Dennis Maddux
Rt. 2, Box 78
Crossville, TN 38555

409 70 8936 3

**FROM:** *(Name and Address of County ASCS Office)*

Cumberland County ASCS Office
P.O. Box 87
Crossville, TN 38555

47 035

**I. PRODUCER:**

Based on your compliance with the PIK Diversion Program, you are entitled to the PIK quantity of the commodity shown in Section 1A. You or your assignee must present this form to the warehouse-man and take title to the commodity shown below no later than the date specified in Section 1B.

| A. ENTITLEMENT QNTY. *(Bushels/pounds)* | B. DATE |
|---|---|
| 10,128 bushels | 2-29-84 |

**II. COMMODITY ENTITLEMENT TO BE DELIVERED**

| A. COMMODITY | B. QUANTITY* | C. QUALITY* | D. STORED AT | E. WHSE. CODE |
|---|---|---|---|---|
| Corn | 10,128 bu. | #2 YC | Cargill, Chattanooga, TN | 4-5674 5304 |
| | | | Call Toll Free 800-321-7581 | |

*If quality is different from base grade (No. 1 wheat, except No. 2 in case of soft red winter; No. 2 yellow corn; No. 2 grain sorghum; and regional grade established for rice) quantity has been adjusted to compensate for the difference.

**III. COUNTY APPROVAL**

For CCC *[signature]* DATE *[handwritten]*

**IV. WAREHOUSEMAN** *(Endorsement Required)*

I certify that I delivered the quantity and quality of the commodity shown above at rates not in excess of those approved under the Uniform Grain Storage Agreement, Uniform Rice Storage Agreement, or PIK Handler's Agreement. (Producer must endorse and date in Section V. Retain Part 2 as proof of delivery.)

SIGNATURE *[signature]* DATE 8-31-84

**V. PRODUCER CERTIFICATION**

I certify that I received the quantity and quality of the commodity shown above.

SIGNATURE *[signature] Dennis M[...]* DATE 3-99-84

PART 3 - PRODUCER—Retain for your records.