IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
July 15, 2025 Session

## KATHRYN CLAIRE ADAMS v. CHARLENE S. FIELDS

**Appeal from the Chancery Court for Campbell County**
**No. 7CH1-2022-CV-81     Elizabeth C. Asbury, Chancellor**

———————————————————

## No. E2024-01206-COA-R3-CV

———————————————————

This case concerns a dispute between a decedent's daughter, acting in her capacity as the executrix of her father's estate, and her father's paramour. The Chancery Court for Campbell County ("the Trial Court") found that the father's paramour, the defendant, had exerted undue influence on him and converted approximately $241,000 from his accounts for her own benefit prior to his death. The defendant appeals. Discerning no reversible error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed; Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which THOMAS R. FRIERSON, II, and KRISTI M. DAVIS, JJ., joined.

Curtis W. Isabell, Clinton, Tennessee, for the appellant, Charlene S. Fields.

David A. Winchester, LaFollette, Tennessee, for the appellee, Kathryn Claire Adams.

## OPINION

## Background

In April 2022, Kathryn Claire Adams ("Adams"), daughter of Randolph D. Miller ("Miller"), filed a complaint in her capacity as executrix of his estate against Charlene S. Fields ("Fields"), Miller's longtime companion since 1998. Adams brought claims for conversion, breach of fiduciary duty, fraud, improper possession of real property, and other miscellaneous claims.

According to Adams's complaint, Miller was in the final stages of terminal cancer when he executed a durable power of attorney ("POA") appointing Fields his attorney-in-fact on April 12, 2021. Although Miller was lucid at the time, he was in a weakened state and needed assistance with his affairs. Adams alleged that within days of her appointment as Miller's attorney-in-fact, Fields used the POA to withdraw large sums of money from an existing line of credit Miller had with Regions Bank. Miller died eleven days after he executed the POA.

Fields allegedly used these sums for her own benefit without Miller's knowledge. Fields also allegedly wrote numerous checks on Miller's bank account which were used for improvements to one of Miller's properties, 1103 Cove Point Road, LaFollette, Tennessee ("the Cove Point Property"), which Fields knew she would inherit based on the terms of Miller's will. Miller's will provided for his children to inherit his residence at 475 South Shorewood Lane, Caryville, Tennessee ("the Shorewood Property"), but after his death, Fields did not vacate the premises. Adams filed a notice of lien *lis pendens* on the Cove Point Property. Adams sought damages in the amount of nearly $360,000. Adams filed an amended complaint which was substantially similar to the first. Fields filed an answer denying the substance of Adams's allegations and claims.

Trial was in April 2024. No court reporter was present, but a statement of evidence was submitted by the Trial Court and is present in the technical record.

The Trial Court entered a judgment against Fields in May 2024. The Trial Court's order showed that Demarcus McMillan[1] ("McMillan"), an assistant Vice President of Regions Bank, testified regarding several of the transactions on Miller's account. For example, there was a check payable to "cash" in the amount of $15,000 for "withdrawal." It was endorsed by Fields. As another example, a few days before Miller died, Fields deposited approximately $166,000 from Miller's home equity line of credit ("HELOC") into Miller's checking account and then into her account. McMillan also testified about checks written for "Charlene's life insurance" and flooring and windows.

Adams testified that she had not visited her father very often because she has a handicapped son and lives in Ohio. She has known Fields since 1998 when Fields began dating Miller. She testified that Fields continued to live at the Shorewood Property eighteen months after Miller's death. She further explained that she had been unable to locate some of Miller's personal property, including "collections and paintings from his European ancestors," located at the Shorewood Property. She valued these items at $37,000. Adams had requested Fields to vacate the Shorewood Property, but she did not do so. While Fields lived there, Miller's estate paid all utilities, HOA fees, dock fees, and mortgage payments totaling $11,000. Adams never specifically requested rent from Fields.

---

[1] McMillan is sometimes referred to as "Dean McMillan" in the record.

Adams testified that Fields tried to keep Miller's children away from him. Michelle Strohmenger ("Strohmenger"), Adams's sister, testified that when she would call her father, Fields would answer and not let her talk to him. Fields told her that Miller did not wish to see any of his children.

During a visit on April 19, 2021, Adams and her daughter witnessed Miller in excruciating pain. Fields, his full-time caregiver, gave him Aleve rather than prescribed pain medication. Miller was described as not being in his right state of mind. Adams's daughter testified that it was "hard to keep track of conversation" with him and that he was moaning with pain and was short of breath. Fields had him transferred to the hospital after Adams and her daughter left. He was released from the hospital into hospice care, slipped into a coma on April 21, 2021, and died on April 23, 2021.

Although not described in the judgment, the Trial Court outlined Fields's testimony in the statement of evidence. Fields testified that Adams and her family rarely visited Miller and that she did not prevent them from visiting or talking to Miller on the phone. Fields attempted to testify about Miller's statements about the money transfers, about his desire for a mausoleum,[2] and improvements to the Cove Point Property. The Trial Court sustained Adams's objection based on the Dead Man's Statute, Tenn. Code Ann. § 24-1-203, and would not allow Fields to testify about what Miller said on these points, despite Adams's witnesses having testified about Miller's previous statements. The Trial Court pointed out that Fields had not objected to Adams's and her witnesses' testimony.

Fields testified that she did not direct Miller's finances, that he would tell her what to do, she would write checks, and he would sign them. She further stated that all the work completed on the Cove Point Property had been arranged by Miller. She did not make those decisions given that the property did not belong to her yet. Fields testified that she did not transfer money from the HELOC to her account, that she had never used the POA, that she did not sign any of the checks presented by Adams, and that she did not take any of Miller's money. According to Fields, Miller had been in his right mind and had conducted his business as he always had.

Fields also contested Adams's claim that she took or sold the personal items Adams claimed were missing from the Shorewood Property. Fields testified that she could not vacate the Shorewood Property until Adams removed her personal property from the Cove Point Property.

---

[2] Adams alleged in her complaint that Fields contracted with White Monument Co. to purchase a mausoleum for Miller, contrary to his wishes. Adams argued that the cost of the mausoleum should be borne by Fields.

The Trial Court made the following findings of fact and conclusions of law:

In this case, Mr. Miller was 74 years of age at the time of the disputed transaction. He was a cancer patient. Although he previously managed his own affairs, at the time in question, he was very weak and experiencing significant pain. Defendant was his primary caregiver. Visits and phone calls from his children were not welcomed by Defendant. Defendant often made excuses to discourage them from talking with their Father by phone or visiting. During the relevant time period, Mr. Miller received no independent advice. He was in an emotional state. Frankly, he was a few short days from death at the time of these transactions. At the time of the April 19 & 20, 2021 transactions he was hospitalized and being set up with hospice care.

Clearly, Mr. Miller had executed a Power of Attorney for Defendant. She acknowledged its existence but denied using it. Therefore, the Court cannot conclude that a confidential relationship existed as a matter of law. However, as a matter of fact, the Court does conclude that Defendant exerted undue influence over Mr. Miller based on the aforementioned "suspicious circumstances", thus, raising a presumption of undue influence. So, the burden of proof shifts to Defendant to rebut the presumption. Thus, she must show by clear and convincing evidence that the transaction was fair. She failed to do so.

In this case, Defendant did not deny depositing approximately $166,000.00 of Mr. Miller's money into her personal account within a day or so preceding his death. She offered no explanation as to the use of the funds. Regarding the payments to laborers and material providers for the Cove Point property, she testified that Mr. Miller had been very involved in all remodeling issues at that property until he died. In viewing Exhibit 1, the only check written before he became extremely debilitated was on April 1, 2021 to Dolpa Tautla for $5250.00 Re: Cove Point property-stone installation. No other expenditures for that property were made from January 1, 2021 through April 1, 2021.

* * *

Plaintiff has proven by clear and convincing evidence that Defendant exerted undue influence over Mr. Miller which resulted in Defendant receiving funds or benefitting from the Decedent's funds to which she was not entitled.

- 4 -

The Trial Court found that Adams had proven by clear and convincing evidence that Fields exerted undue influence over Miller, resulting in her receipt of and benefit from funds totaling $241,129.75. The Trial Court awarded the estate $37,000 for the personal property missing from the Shorewood Property. The Trial Court placed a lien on all property, real or personal, to be received by Fields via Miller's will. After the Trial Court denied her motion for a new trial, Fields appealed.

## Discussion

Although not stated exactly as such, Fields raises the following issues on appeal: (1) whether the Trial Court erred in finding that Fields exerted undue influence over Miller and (2) whether the Trial Court erred in awarding a judgment for personal property without an appraisal of inventory or value and without proper foundation.

The standard of review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon Cnty. Bd. of Educ.,* 58 S.W.3d 706, 710 (Tenn. 2001).

This Court has explained the concepts of "confidential relationship" and "undue influence" as follows:

> "The dominant rule in Tennessee and elsewhere is that the existence of a confidential relationship, followed by a transaction wherein the dominant party receives a benefit from the other party," gives rise to a presumption of undue influence that "may be rebutted only by clear and convincing evidence of the fairness of the transaction." *Matlock v. Simpson*, 902 S.W.2d 384, 386 (Tenn. 1995) (citing *Roberts v. Chase*, 25 Tenn. App. 636, 166 S.W.2d 641 (1942); *Richmond v. Christian*, 555 S.W.2d 105 (Tenn. 1977); *Hogan v. Cooper*, 619 S.W.2d 516 (Tenn. 1981); *Brown v. Weik*, 725 S.W.2d 938 (Tenn. App. 1983); *Estate of Depriest v. Allen*, 733 S.W.2d 74 (Tenn. App. 1986); 19 A.L.R.3d 575, 596). Here, Christina concedes that a confidential relationship existed. *See In re Estate of Link*, 542 S.W.3d 438, 453 (Tenn. Ct. App. 2017) ("[A] confidential relationship arises as a matter of law when an unrestricted power of attorney is granted in favor of the dominant party and is, in fact, exercised by the dominant party.") "The execution and exercise of a power of attorney establishes a fiduciary relationship between the attorney-in-fact and the grantor of the power," such that the fiduciary is obligated to deal with the property of the principal in the utmost good faith. *Bottorff v. Sears*, No. M2017-01363-COA-R3-CV, 2018 WL 3574745, at *6 (Tenn. Ct.

App. July 25, 2018) (citation omitted). "[T]he presumption of undue influence extends to all dealings between persons in fiduciary and confidential relations, and embraces gifts, contracts, sales, releases, mortgages and other transactions by which the dominant party obtains a benefit from the other party." *Parish v. Kemp*, 179 S.W.3d 524, 531 (Tenn. Ct. App. 2005) (quoting *Gordon v. Thornton*, 584 S.W.2d 655, 658 (Tenn. Ct. App. 1979)). Christina was the dominant party in the confidential relationship and clearly benefitted from the gift. Thus, a presumption of undue influence arose, and Christina must establish that the transaction was fair by clear and convincing evidence. *Id.*

"Determining whether undue influence has occurred is a question of fact." *Jarnigan v. Moyers*, 568 S.W.3d 585, 591 (Tenn. Ct. App. 2018) (citing *Cartwright v. Jackson Capital Partners, Ltd. P'ship*, 478 S.W.3d 596, 607 (Tenn. Ct. App. 2015)). As such, an appellate court must "affirm the trial court's finding of undue influence unless the evidence preponderates otherwise." *Id.* Because direct evidence of undue influence is rarely available, undue influence can be established by showing "suspicious circumstances" leading to a conclusion that the allegedly influenced person did not act freely and independently. *Id.* At the same time, however, a presumption of undue influence can be rebutted by showing a lack of suspicious circumstances. *In re Est. of Lipscomb*, No. W2018-01935-COA-R3-CV, 2020 WL 1549596, at *10 (Tenn. Ct. App. Apr. 1, 2020) (citing *Parish v. Kemp*, 308 S.W.3d 884, 891 (Tenn. Ct. App. 2008)). The following "suspicious circumstances" are relevant to the analysis:

> (1) the decedent's advanced age and/or physical or mental deterioration; (2) the dominant party's active involvement in the transactions at issue; (3) secrecy concerning the transaction's existence; (4) the lack of independent advice; (5) the decedent's illiteracy or blindness; (6) the unjust or unnatural nature of the transaction; (7) the decedent being in an emotionally distraught state; (8) discrepancies between the transaction and the decedent's expressed intentions; and (9) fraud or duress directed toward the decedent.

*Id.* at *11 (citing *In re Est. of Brindley*, No. M1999-02224-COA-R3-CV, 2002 WL 1827578, at *14 (Tenn. Ct. App. Aug. 7, 2002)). The scope of evidence regarding fairness is quite broad, and there is no mathematical formula for determining the number or type of suspicious circumstances that will support a finding of undue influence. *Id.* at *10-11. Ultimately, the difficulty of establishing the fairness of a transaction can vary depending on the circumstances of the case and the strength of the

presumption of undue influence. *Id.* at \*10 (citing *In re Est. of Murdaugh*, No. W2011-00041-COA-R3-CV, 2011 WL 6141067, at \*3 (Tenn. Ct. App. Dec. 8, 2011)). Proof of independent advice may be required if the fairness of the transaction would be difficult to prove otherwise, but this requirement typically arises when the transaction in question is a gift from a feeble or incompetent subservient party and leaves the donor impoverished. *Id.*

*Ellis v. Duggan*, 644 S.W.3d 85, 114-16 (Tenn. Ct. App. 2021).

As it relates to Fields's first issue, we note that the "Dead Man's Statute," codified at Tenn. Code Ann. § 24-1-203, provides:

In actions or proceedings by or against executors, administrators, or guardians, in which judgments may be rendered for or against them, neither party shall be allowed to testify against the other as to any transaction with or statement by the testator, intestate, or ward, unless called to testify thereto by the opposite party. If a corporation is a party, this disqualification shall extend to its officers of every grade and its directors.

This Court has explained the function and purpose of the Dead Man's Statute as follows:

The purpose of the Dead Man's Statute is to protect estates from spurious claims and prevent interested parties from giving self-serving testimony regarding conversations or transactions with the deceased when the testimony involves transactions or statements that would either increase or decrease the deceased's estate. *In re Est. of Marks*, 187 S.W.3d 21, 28 n.2 (Tenn. Ct. App. 2005). The statute is designed "to prevent the surviving party from having the benefit of his own testimony, when, by the death of his adversary, his representative was deprived of his executor's version of the transaction or statement." *McDonald v. Allen*, 67 Tenn. 446, 448 (1874). Nevertheless, as discussed in *Holliman v. McGrew*, "[a] witness does not become wholly incompetent to testify when the statute applies, but the statute does limit the subjects a witness can address." 343 S.W.3d 68, 73 (Tenn. Ct. App. 2009).

*Mitchell v. Johnson*, 646 S.W.3d 754, 765 (Tenn. Ct. App. 2021) (footnote omitted).

Fields first argues that the Trial Court erred by excluding her testimony about Miller's statements due to the Dead Man's Statute. Although her argument is not entirely clear, it appears Fields contends that the Dead Man's Statute did not apply to the proceedings because the lawsuit was "about ownership of property more than distribution." Her argument appears to be that the Dead Man's Statute did not apply because the lawsuit did not involve "transactions or statements that would either increase

- 7 -

or decrease the deceased's estate." *Id.* Based upon our review of the record and applicable case law, we disagree.

Adams filed her original and amended complaints as the executrix of Miller's estate and made claims that Fields converted Miller's property to her own use and benefit. Her excluded testimony regarding statements by Miller were intended to legitimize her use of funds that would have otherwise been part of the estate after Miller's death. Without Fields's transactions, Miller's estate would have been larger. We, therefore, fail to apprehend how her attempted testimony would have fallen outside the scope of testimony involving "transactions or statements that would either increase or decrease the deceased's estate."

As for Fields's complaint that the Trial Court allowed Adams, her sister, and her daughter to testify about Miller's statements, we emphasize that she did not contemporaneously object to their testimony. "It is well-settled that the failure to object during trial constitutes a waiver of the issue on appeal." *Cardiac Anesthesia Servs., PLLC v. Jones*, 385 S.W.3d 530, 537 (Tenn. Ct. App. 2012). We therefore find no reversible error in the Trial Court's exclusion of her testimony regarding Miller's statements.

Fields next contests the Trial Court's finding of undue influence. Whether there has been undue influence is a question of fact that this Court must affirm unless the evidence preponderates otherwise. Upon our review of the Trial Court's statement of evidence, we conclude that the evidence does not preponderate against the Trial Court's finding of undue influence.

The Trial Court did not find a confidential relationship as a matter of law based upon its finding that Fields did not use the power of attorney. Neither party raises an issue with this finding. Nevertheless, the Trial Court found "suspicious circumstances" which led it to conclude that Fields had exerted undue influence over Miller as a matter of fact. Fields takes issue with many of these findings largely by referencing her own testimony. However, the Trial Court clearly did not find her testimony credible. *See Edmunds v. Delta Partners, L.L.C.*, 403 S.W.3d 812, 824-25 (Tenn. Ct. App. 2012) ("[A] trial court's finding on credibility may be implied from the manner in which the trial court decided the case."). Given that we have only a statement of evidence provided by the Trial Court, and that it evidently did not find Fields credible, the limited evidence we have before us supports the Trial Court's finding of undue influence.

The Trial Court found the following suspicious circumstances demonstrating undue influence: (1) Miller was a 74-year old cancer patient who was "very weak and experiencing significant pain" at the time; (2) Fields was his primary caregiver; (3) Fields did not welcome visits or phone calls from Miller's children; (4) Fields often made excuses to discourage them from talking with their father by phone or visiting; (5) Miller

received no independent advice; (6) Miller was in an emotional state; (7) Miller was a few days from death at the time of the transactions; and (8) at the time of the April 19 and 20, 2021 transactions, Miller was hospitalized and being set up with hospice care. Recognizing that "there is no mathematical formula for determining the number or type of suspicious circumstances that will support a finding of undue influence," *Ellis*, 644 S.W.3d at 115, we conclude that these suspicious circumstances establish that Fields unduly influenced Miller, particularly given his weakened physical and mental state at the time of the transactions.

Fields argues that there were no suspicious circumstances surrounding the relevant transactions but, again, in doing so mostly depends on references to her own testimony. The Trial Court did not find Fields's testimony convincing. The Trial Court found that Fields did not deny depositing approximately $166,000 of Miller's funds into her personal account a day or so before his death. She offered no explanation for the use of these funds. In terms of Fields's testimony that Miller had been involved in the remodeling of the Cove Point Property, and apparently supportive of her expenditures of his money for the remodeling, the Trial Court noted that the only evidence in support of her testimony was a check written for stone installation at the property before he was debilitated. The Trial Court apparently found this insufficient support for her contention. Given the deference granted to the Trial Court's credibility determinations, we conclude that Fields's reliance on her own testimony is insufficient to demonstrate that she did not unduly influence Miller, and we affirm the Trial Court's finding. *Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999) ("[A]ppellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary.").

Lastly, Fields argues that the Trial Court erred by allowing Adams to testify about the values of the missing property. Both parties acknowledge the general principle that a party may testify about the value of his or her own property. *See* Tenn. R. Evid. 701(b) ("A witness may testify to the value of the witness's own property or services."); *Maddux v. Cargill, Inc.*, 777 S.W.2d 687, 693 (Tenn. Ct. App. 1989) ("Generally, a plaintiff may testify as to the value of his own personal property, even though he does not qualify as an expert on the market value of such personal property."). Fields, however, contends that because Adams did not personally purchase the missing property or know whether these items "actually made the move to the property when Randolph Miller moved there," she was unqualified to testify about their values. In so arguing, Fields presents no case law to support this contention, and we likewise have found none.

Moreover, we have found at least one case that suggests someone such as a conservator of personal property or executor of an estate is qualified to testify about the value of a deceased's property. In *Levine v. March*, 266 S.W.3d 426 (Tenn. Ct. App. 2007), the conservator of the property of a woman murdered by her husband testified about the value of the wife's property. *Id.* at 430. On appeal, the appellants argued that

the trial court erred by permitting and considering the conservator's testimony, but this Court found their argument waived because the appellants did not object to the conservator's testimony during trial. *Id.* at 440. In a footnote, however, this Court elaborated:

> Were we to consider the substance of this issue, we would quickly conclude that the conservator of an absent or deceased party's property stands in the shoes of the absent or deceased party and, therefore, may testify with regard to the value of the absent or deceased party's property under Tenn. R. Evid. 701(b). *Reynolds v. Day*, 792 S.W.2d 924, 928 (Tenn. Ct. App. 1990), *rev'd on other grounds, Matlock v. Simpson*, 902 S.W.2d 384 (Tenn. 1995) (permitting the personal representative of a decedent to testify concerning the value of the decedent's property); *Crail v. Blakely*, 8 Cal.3d 744, 106 Cal. Rptr. 187, 505 P.2d 1027, 1035 n. 7 (1973) (holding that the administrator of an estate possessed sufficient personal knowledge to give an opinion regarding the value of the decedent's property).

*Id.* at 440 n.15. We find Fields's argument unconvincing and lacking legal or evidentiary support.

Ultimately, we have little to review in this case given that there is no transcript. We have only the statement of evidence which essentially mirrors the Trial Court's judgment. Fields's bare-bones argument that Adams did not purchase the items or know whether they were moved to his most recent residence without supporting case law or any countervailing evidence as to the items' values in the record leaves us with no other viable option than to affirm the Trial Court's finding as to these items' values, particularly given that the Trial Court evidently found Adams credible. Discerning no reversible error, we affirm the Trial Court's consideration of Adams's testimony on the value of these items and the Trial Court's judgment as a whole.

## Conclusion

For the foregoing reasons, we affirm the Trial Court's judgment and remand for collection of costs below. Costs of the appeal are assessed against the appellant, Charlene S. Fields, and her surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE