IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
March 11, 2015 Session

# BETTY GOFF C. CARTWRIGHT, ET AL. v. JACKSON CAPITAL PARTNERS, LIMITED PARTNERSHIP, ET AL.

**Direct Appeal from the Chancery Court for Shelby County**
**No. CH-04-1266-2     Arnold B. Goldin, Chancellor**

---

**No. W2013-01865-COA-R3-CV – Filed May 21, 2015**

---

This appeal involves claims asserted by a beneficiary of various trusts against numerous defendants, including the beneficiary's sister and her husband, who serve as the trustee and co-trustee of some of the trusts. Among other things, the beneficiary alleged that the defendant-trustees breached their fiduciary duties by failing to pay the beneficiary all distributions to which he was entitled. The defendants moved for partial summary judgment, claiming that they had followed the terms of the trusts and paid the beneficiary all distributions to which he was entitled pursuant to the trust documents. In response to the motion for partial summary judgment, the beneficiary asserted that the trust documents were void because he executed them due to undue influence. In a previous appeal, this Court reversed the entry of partial summary judgment on the issue of undue influence, concluding that genuine issues of material fact existed. The parties engaged in additional discovery on remand, and after lengthy proceedings and numerous evidentiary and other rulings, the trial court granted summary judgment to the defendant-trustees and denied a motion for partial summary judgment filed by the beneficiary. The trial court also awarded attorney's fees and discretionary costs to the defendants. The beneficiary appeals. We affirm and remand for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed and Remanded**

BRANDON O. GIBSON, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and KENNY ARMSTRONG, J., joined.

Jerry E. Mitchell, John H. Dotson and Justin Edward Mitchell, Memphis, Tennessee, for the appellant, Alan C. Cartwright.

David Clark Wade and Andrew Roger Jeffrey Gardella, Memphis, Tennessee, for the appellees, Jackson Capital Partners, Limited, Jackson Capital Management, LLC, Alan L. Garner and Alice Cartwright Garner.

## OPINION

### I. FACTS & PROCEDURAL HISTORY

This is the second time this case has been before this Court. The relevant facts and procedural history are set forth in this Court's previous opinion as follows:

> In the early 1950's, James and Betty Cartwright adopted two children, Alan and Alice. James Cartwright was an attorney, and over the years, he placed the wealth that he and his wife accumulated into numerous trusts for the benefit of his family members and others. James Cartwright died in 1994. In 2004, Betty Cartwright remarried and initiated this case by filing a complaint in the chancery court of Shelby County, naming as defendants her children Alan and Alice, Alice's husband, eighteen trusts, and two entities involved with the family limited partnership. Alice served as trustee of several trusts of which Betty was a beneficiary, and the complaint alleged that Alice had breached fiduciary duties, engaged in self dealing, and created impermissible conflicts of interest. Accordingly, the complaint sought to have Alice removed as trustee. The complaint also alleged that Alice and her husband had breached their fiduciary duties as general partners of the family limited partnership, and it sought to have the family limited partnership dissolved. Betty's complaint further alleged fraud, breach of contract, and breach of the duty of good faith and fair dealing. The complaint listed Betty's son Alan and the eighteen trusts simply as "Declaratory Defendants."

> Alan Cartwright subsequently filed an answer and cross-claim against the other defendants, which stated, "To the extent that the allegations in the Complaint are found to be true, they are equally applicable to Alan Cartwright, and therefore, they are adopted and incorporated herein by reference as completely and fully as if restated herein verbatim[.]" Alan alleged that he had also been deprived of assets as a trust beneficiary, and he sought removal of Alice as trustee, in addition to access to the trust corpus to the extent that the court deemed appropriate.

> Betty Cartwright died in May 2005, and thereafter, an order was entered dismissing with prejudice all of the claims set forth in her

2

complaint against the original defendants. However, the cross-claim filed by Alan remained pending.

. . . .

Alice and her husband, who served as co-trustee of some of the trusts, filed a motion for partial summary judgment with respect to Alan's claim for breach of fiduciary duty, asserting that they had fully complied with the terms of the trust documents and that Alan had received all distributions to which he was entitled. According to the defendants, the benefits and payments which Alan sought were contrary to the terms of the trust documents. The defendants argued that, as a matter of law, the trustees could not be found to have breached their fiduciary duties when the undisputed facts demonstrated that they had followed the directions of the trusts. They cited several provisions of the Tennessee Uniform Trust Code, including Tennessee Code Annotated section 35-15-801, which directs a trustee to follow the terms and purposes of the trust, and section 35-15-1006, which states, "A trustee who acts in reasonable reliance on the terms of the trust as expressed in the trust instrument is not liable to a beneficiary for a breach of trust to the extent the breach resulted from the reliance." In sum, the defendants argued that Alan could not prove that they had violated the terms of the trust documents or failed to pay him what he was due under the trust documents, and therefore, there was no basis for removing them from their position as trustees.

In support of their motion for partial summary judgment, the defendants submitted numerous trust documents, interrogatory responses, and testimony by affidavit and deposition. This evidence showed that on June 30, 1978, James Cartwright and Alan Cartwright executed the "Alan Cook Cartwright Grantor Trust Agreement," which created what the parties commonly refer to as the ACC Grantor Trust. The Trust Agreement provided that the ACC Grantor Trust would "provide for [Alan's] personal financial security by preserving his property against his own spend thrift actions," as Alan was "not experienced in financial matters." According to the Trust Agreement, Alan was limited to drawing 75% of the net income of the ACC Grantor Trust for his use or benefit. The Trust Agreement provided that the ACC Grantor Trust was irrevocable, and that the Trust Agreement could only be amended or terminated upon written agreement of the trustee and Alan. James Cartwright was named as the trustee, and Betty was named as the successor trustee. Pursuant to a later amendment, Alan's sister Alice was named as an alternate successor trustee, who would serve

3

in the event that Betty became unwilling or unable to act as trustee.

James Cartwright died on September 11, 1994. "Amendment Number One" to the ACC Grantor Trust was executed by Alan, who was about 43 years old at the time, and his mother Betty, who had assumed the position of trustee, on or about September 7, 1995. The Amendment stated, in relevant part:

> During [Alan's] lifetime, the Trustee shall pay (i) the lesser of $84,000 per year or one hundred percent (100%) of the net annual income of the trust in convenient installments, or otherwise, to or for the benefit of [Alan], plus (ii) such additional amount as the Trustee determines is necessary to pay the federal and state income tax of [Alan.] In computing the annual net income of the trust, any distributions of income from the trusts identified on Exhibit A which are added to this trust shall be considered income. . . .

> [Alan] directs the trustees of the trusts listed in Exhibit "A" hereto to pay all amounts distributed to [Alan] under such trusts to the Trustee hereunder, such amounts to be added to the corpus of the Trust and distributed in accordance with its terms, and the Trustee hereby consents to such additions.

The referenced "Exhibit A" to the Amendment listed 15 other trusts of which Alan was a beneficiary. Therefore, pursuant to the terms of the Amendment, all amounts to be distributed to Alan from the 15 trusts would instead be added to the corpus of the ACC Grantor Trust, and therefore, subject to distribution under its terms. According to Alice's testimony, her mother directed the family attorney to prepare this Amendment, requiring all distributions to Alan to be made through the ACC Grantor Trust, in order to carry out the desire of Alan's recently deceased father to protect the assets from Alan's spendthrift tendencies, but also to ensure that there would be enough assets available to pay Alan his increased "allowance" of $7000 per month pursuant to the Amendment.

According to Alice's affidavit testimony, her mother later learned that Alan had acquired several vehicles, and she became upset about his high-interest car notes and speeding tickets. Betty then informed Alan that he would have to sell some of the vehicles and reimburse the Trust for the excessive expenses associated with them, such as auto insurance, which the

4

Trust was paying on Alan's behalf. The Trust would also pay off the car notes. Consequently, Betty and Alan executed another amendment to the ACC Grantor Trust on April 29, 1996, which reduced his monthly distribution to $5000. The second amendment was inadvertently also titled "Amendment Number One," and it contained the same language quoted above, regarding the monthly allowance, and the addition of any distributions from the trusts in Exhibit A to the ACC Grantor Trust. However, it substituted $60,000 for the $84,000 figure in the first Amendment.

In December 1999, another amendment was executed by Alan and Betty, naming Alice as co-trustee of the ACC Grantor Trust, effective January 1, 2000. After Alice was named co-trustee, she and her mother increased Alan's monthly distribution to $7000 again, but the parties never executed another amendment to reflect this change.

According to Alice's testimony, her practice over the years, as trustee of the ACC Grantor Trust, was to treat the specific dollar amounts listed in the Amendments as the amount that Alan would receive, even though the language of the Amendments provided that he would receive *the lesser of* 100% of the trust income or $84,000 per year. She explained that even when there was a substantial market downturn, or little to no income for distribution, she paid Alan a direct distribution of the amount referred to in the trust documents. As a result, she explained, Alan had received direct distributions of either $5000 or $7000 per month since 1995. Alice testified that over the years, the ACC Grantor Trust had also paid for Alan's major expenses, including all taxes, insurance (home, health, and automobile), medical costs, and home maintenance costs, and the ACC Grantor Trust also acquired and owned the home where Alan lived. She produced a spreadsheet indicating that Alan had received distributions of $592,477 in the past five years, and also, $696,437 in expenses were paid on his behalf during that time. In sum, Alice testified that all required distributions had been made to Alan through the ACC Grantor Trust, in accordance with the controlling trust documents.

Alan filed a response to the defendants' motion for partial summary judgment with the following [] argument [relevant to this appeal]:

. . . .

3. The [defendants], both directly and indirectly by

5

employing duress and undue influence by others, knowingly and maliciously defrauded the beneficiary of these trusts, Alan Cartwright, by trickery and by deception in failing to present alleged "Exhibit A" for review and in failing to explain the practical operation and consequences of the First Amendment(s) to the Amended and Restated Alan Cook Cartwright Grantor Trust at the time Cartwright was urged to sign the amendments to his Grantor Trust while under economic duress and/or by creating a false "Exhibit A" at a later time, all in contravention of the fiduciary duties owed to him at those times and all subsequent times thereto. As a result, the existence and operation of the so called "Exhibit A" is void and the First Amendment(s) are void as being made by the Grantor being led into a clear mistake of law and fact as to the meaning and consequences of executing the signature page that day.

In response to the defendants' statement of undisputed facts, Alan disputed one statement regarding "Exhibit A" to the Amendments, which listed the 15 trusts to be added to the ACC Grantor Trust. Alan contended that "reasonable minds could very well conclude that no such document existed until sometime later and that it is a fake." . . . .

Alan also submitted several excerpts from his depositions, apparently in an effort to demonstrate undue influence. Alan testified that when he signed the first Amendment Number One to the ACC Grantor Trust, he did not understand that he would be limited to the lessor of $84,000 per year or the income from the trust because no one told him. When asked whether he asked his mother what he was signing, Alan replied, "I didn't ask her anything. You don't ask questions in my family. You just do what they tell you to do." Alan conceded that he received $7000 per month in distributions from the ACC Grantor Trust until the issue arose about his ownership of numerous vehicles. Alan recalled his mother telling him that he was going to receive less money each month until the trust was reimbursed for the cost of his additional vehicles. However, Alan testified that he did not remember if he was with his mother when he signed the second Amendment Number One, and he also said, "I don't remember anybody telling me about 60,000 a year." Alan testified that he did not remember reading the document or having anyone explain it to him. He said,

I didn't read this, but then again if I -- I don't even remember -- I don't know what this is. I never have seen this. I mean, I might have signed it, but maybe the rest of it wasn't there or something like this. I didn't -- I don't know -- I don't remember Mom signing it. When she signed it, she didn't tell me what it was. I don't know what--what else do I say here. I don't know how else to explain it.

Despite these protestations, Alan submitted a statement of undisputed facts in which he admitted that Betty, Alice, and the family attorney were present in the room with him when the second amendment to the ACC Grantor Trust was signed.

In reply to Alan's response, the defendants contended that there was no genuine issue of material fact regarding the validity or authenticity of Exhibit A. . . .

The defendants also argued that, despite Alan's conclusory assertions, the undisputed facts did not establish undue influence. They submitted Alice's deposition testimony wherein she suggested that the first Amendment may have been sent to Alan at his home in Hendersonville, because his signature was notarized in Sumner County, Tennessee, while Betty's signature was notarized five days earlier in Shelby County, Tennessee. With regard to the second Amendment, Alice testified that she specifically recalled the meeting at which Alan and her mother signed the Amendment. She testified that the meeting took place in Memphis, and that she was present, along with Alan, Betty, and the family attorney, Shellie McCain. Alice recalled that her mother got "really mad" because after she had increased Alan's monthly distribution, she found out that he had acquired three trucks and was paying notes on a couple of them. Alice recalled her mother telling Alan that he had to sell one of the trucks and that she was going to reduce his monthly distribution in order for him to repay the trust for paying off the balance on one of the notes. Alice testified that she did *not* recall a situation in which her mother instructed Alan to "just sign it." She said that Mr. McCain was there "to go over things with [Alan]," and that Mr. McCain "told Alan what we were doing." She also testified that Exhibit A was discussed at the meeting.

The defendants submitted testimony from the deposition of the former family attorney, Shellie McCain, as well. At Mr. McCain's deposition in 2009, he testified that, to the best of his recollection, he was

present for at least one meeting when Alan signed amendments to the ACC Grantor Trust. Mr. McCain could not recall how many of such meetings he attended. However, he stated that his "most vivid memory" was "sort of a family sit down presided over by Mrs. [Betty] Cartwright" to discuss Alan's spending, and particularly his acquisition of a number of automobiles and the cost of keeping those automobiles insured. He recalled that "Alan arrived in a somewhat non-communicative mood with anyone in the office," but when Betty arrived, "Alan was suddenly communicative and yes ma'am, no, ma'am and very much acknowledging his mother's concerns." Mr. McCain testified that Alan essentially wanted to know how many cars he could keep. He explained, "Mrs. [Betty] Cartwright was a very nice lady, but when she wanted to exercise her authority, she was fairly formidable." Mr. McCain said he did not remember the specifics of what he discussed with Alan during the meeting "other than if he signed documents in my presence, I'm certain that, you know, any questions he had I would have answered about those documents." Mr. McCain went on to say,

> It is my recollection hazy as though it may be, that the purpose of inviting me to the office when Alan was there was to give Alan the opportunity to ask me questions. I don't remember if I gave preliminary overview to Alan about what, you know, at any point was being done in connection with the family's overall estate planning. I just don't remember. What I do remember is generally when I was in Alan's presence or when Alan was in my presence, he was generally and frankly somewhat indifferent to what was going on in the family business, if you will.

Mr. McCain testified that when he sat down with someone to present a document for his or her signature, it was his normal practice to explain what it was he or she was signing. He said he could not remember the specifics of what he discussed with Alan, but, he said, "if I was present when a document was signed, then if Alan Cartwright wanted to, I'm assuming that I probably explained what the document was he was signing and if he had questions, answered it."

During Alan's deposition, he testified that he did recall attending a meeting with Mr. McCain, Betty, Alice, and Alice's husband. He said, "I think they just told me $84,000 a year and sign it." When asked whether he agreed for the trust to pay him that amount, he replied, "Yeah, I -- I agreed,

and I did sign this," but, he said he did not think that was all of the money that he would receive. He conceded that he did not ask whether he would receive any more money, stating, "like again they might have told me -- or this, but the main thing they just told me was to sign the paper. Here, sign the paper." Alan initially testified that no one told him, beforehand, that his annual distribution was going to be reduced to $60,000, and that he called Betty for an explanation when he received his first "light" check. However, Alan later testified that when he had the conversation with Betty about the trust paying off his car notes, he was in Memphis, and "[Alice and her husband] . . . they were all in there." As noted above, his own statement of undisputed facts admitted that Betty, Alice, and the family attorney were present in the room with him when he signed the second amendment to the ACC Grantor Trust.

The trial court ultimately entered an order granting the defendants' motion for summary judgment. The court found that the trust documents expressed the intention of Alan and his parents to provide for him but also to limit his access to unlimited funds. The court noted that Alan admittedly signed the original and all Amendments to the ACC Grantor Trust Agreement. The court noted that the Amendments set specific limitations on Alan's distributions and required that distributions from other trusts be added to the ACC Grantor Trust. The court found that the trustees were entitled to rely upon the terms of the trust documents, and that they had "done what they were entrusted to do." The court found "no dispute that the Trustees paid out to [Alan] the amounts to which he was entitled under the documents as written." The court found it undisputed that the trustees had relied upon the terms of the trust, and it found that they were entitled to do so pursuant to Tennessee Code Annotated section 35-15-1006. Regarding the allegations of undue influence, the trial court noted that many years had passed since Alan and his parents signed the trust documents, and that his parents were no longer living. The court stated, "In light of the language of the documents and the passage of time, the Court cannot give weight to [Alan's] allegations of undue influence against his parents." Therefore, the court entered partial summary judgment in favor of the defendants on the issues surrounding the terms of the family limited partnership documents and the trust documents; whether Alan received the distributions to be made to him under the trust documents; and whether the defendants breached their fiduciary duties in conducting their responsibilities as trustees.

All remaining claims asserted by Alan, not resolved by the motion

9

for partial summary judgment, were voluntarily dismissed without prejudice. Alan timely filed a notice of appeal of the order granting partial summary judgment to defendants.

*Cartwright v. Jackson Capital ("Cartwright I")*, No. W2011-00570-COA-R3-CV, 2012 WL 1997803, at *1-8 (Tenn. Ct. App. Jun. 5, 2012) (footnotes omitted).

In *Cartwright I*, this Court reviewed the trial court's order granting partial summary judgment to the defendants. We noted at the outset that "this case revolves around allegations that Alan had not received sufficient distributions of assets from the trusts." *Id.* at *9. The basis for the defendants' motion for partial summary judgment was that Alan could not prove that they failed to pay the amounts required by the trust documents. According to the defendants, the undisputed facts demonstrated that they followed the trust terms, and they could not have breached their fiduciary duties by paying the amounts required by the trust documents. *Id.* Tennessee Code Annotated section 35-15-801 directs a trustee to follow the terms and purposes of the trust, and section 35-15-1006 states, "A trustee who acts in reasonable reliance on the terms of the trust as expressed in the trust instrument is not liable to a beneficiary for a breach of trust to the extent the breach resulted from the reliance." In support of their motion for partial summary judgment, the defendants submitted evidence regarding the execution and terms of the Amendments to the ACC Grantor Trust. *Id.* at *10. They also submitted evidence demonstrating that since the execution of the Amendments, Alan had received either $5000 or $7000 per month, meeting or exceeding the amounts required by the trust documents, in addition to the payment of his major expenses. Based on this evidence, this Court concluded that the defendants' motion for partial summary judgment was properly supported, and the burden of production shifted to Alan to demonstrate that a genuine issue of material fact existed. *Id.*

In response to the motion for partial summary judgment, Alan had argued that Exhibit A was void either because it was a fabrication or because he signed the Amendments due to undue influence. *Id.* We found no genuine issue of material fact regarding the authenticity of Exhibit A and affirmed the trial court's grant of summary judgment to the defendants on that issue. *Id.* at *11. However, applying the summary judgment standard set forth in *Hannan v. Alltel Publ'g Co.*, 270 S.W.3d 1 (Tenn. 2008), we concluded that genuine issues of material fact existed with regard to the issue of undue influence. A trust can be set aside, in whole or in part, or reformed, on the same grounds as those which apply to a transfer of property not in trust. *Id.* (citing Official Comment to Tenn. Code Ann. § 35-15-406). As such, a trust is void to the extent its creation was induced by fraud, duress, or undue influence. *Id.* (citing Tenn. Code Ann. § 35-15-406). We acknowledged the numerous inconsistencies in Alan's testimony regarding the extent of his knowledge about the Amendments and the circumstances

surrounding their execution. However, we also recognized Alan's argument that "'Tennessee cases have consistently held that the existence of a confidential or fiduciary relationship, *together with a transaction by which the dominant party obtains a benefit from the other party*, gives rise to a presumption of undue influence that may be rebutted.'" *Id.* at \*13 (quoting *Matlock v. Simpson*, 902 S.W.2d 384, 385 (Tenn. 1995)); *see also Richmond v. Christian*, 555 S.W.2d 105, 107 (Tenn. 1977) ("when two parties enter into a confidential or fiduciary relationship and the dominant party receives a gift or other benefit from the other party a presumption arises that some improper advantage was taken"). At the time when the first and second Amendments to the ACC Grantor Trust were executed, Alice held the position of trustee of some of the trusts listed on Exhibit A of which Alan was a beneficiary. Therefore, we explained, a confidential fiduciary relationship existed between Alice and Alan at the time of the signing of the Amendments. *Id.* Alice was also a contingent beneficiary of the ACC Grantor Trust -- if Alan died without a surviving spouse or descendent, the trustee was directed to distribute the remaining corpus of the trust to Alice. (Alan is unmarried and has no children.) Still, based on the record before us, we were unable to determine whether the execution of the Amendments constituted "a transaction by which the dominant party [Alice] obtain[ed] a benefit from the other party [Alan]," which would give rise to a presumption of undue influence that could only be rebutted by clear and convincing evidence of fairness. *Id.* We explained,

> [t]he effect of the Amendments was to *increase* Alan's distributions from 75% to 100% of the income of the trust, *but* subject to the annual "cap." There is no evidence in the record regarding the amount of trust income generated in any given year, other than Alice's undisputed testimony that during the years when the trust had little to no income, Alan received the "lump sum" figure stated in the Amendments. In other years, however, it is not clear how much money Alan would have received if the "cap" had not been imposed on his annual distributions. It is reasonable to infer, for purposes of summary judgment, that because of the cap on Alan's annual distributions, there is the potential for more money to remain in the corpus of the ACC Grantor Trust for potential future distribution to Alice as a contingent beneficiary. At the very least, we conclude that a genuine issue of material fact exists with respect to this issue.

> In sum, we find that a genuine issue of fact exists regarding the ultimate issue of whether undue influence was used to accomplish these transactions. "The determination of whether the dominant party exerted undue influence is a question of fact." *In re Estate of Copas*, No. E2010-00877-COA-R3-CV, 2012 WL 171966, at \*10 (Tenn. Ct. App. Jan. 20, 2012) (citing *Waller v. Evans*, No. M2008-00312-COA-R3-CV, 2009 WL

11

723519, at *9 (Tenn. Ct. App. Mar. 17, 2009)). If the presumption of undue influence arises, then the dominant party bears the burden to prove by clear and convincing evidence that the transaction was the result of the other party's free will and not a result of his or her influence. *Id.* at *11 . . . . In this case, however, viewing the evidence in the light most favorable to Alan, and allowing all reasonable inferences in his favor, as we are required to do at this stage of the proceedings, we find that "reasonable minds" could draw more than one conclusion as to whether these transactions were the product of Alan's free will or the product of undue influence.

*Id.* at *13-14. Accordingly, we reversed the trial court's grant of summary judgment on the issue of undue influence and remanded for further proceedings.

On remand, the parties engaged in further discovery regarding the financial impact of the execution of the Amendments. The trial court entered a scheduling order containing deadlines for discovery, expert witness disclosures, dispositive motions, etc. Throughout the proceedings on remand, the parties vigorously disputed whether Alan received more or less money due to his execution of the Amendments, when compared to what he would have received under the previous terms of the ACC Grantor Trust. In addition to disputing whether the Amendments' pour-over provision and "cap" financially benefitted Alan, or worked to his detriment, Alan also sought to discover facts on remand regarding the creation and funding of two additional trusts – the Alan Cook Cartwright 1996-1 Irrevocable Trust and the Alan Cook Cartwright 1996-2 Irrevocable Trust. Although not specifically mentioned in *Cartwright I*, the second Amendment to the ACC Grantor Trust, which was executed in 1996, also contained a provision stating:

The Settlor [Alan] may request, from time to time, that the Trustee [at the time, Betty] make additional distributions of principal from the trust to enable the Settlor to make gifts to the issue of his sister, ALICE CARTWRIGHT GARNER, in such amounts as he desires. The Trustee may, in her sole discretion, grant such requests in whole or in part.

The Amendment itself did not make any gifts. However, on the same day that the second Amendment was executed, Alan executed other documents creating and funding the Alan Cook Cartwright 1996-1 Irrevocable Trust and the Alan Cook Cartwright 1996-2 Irrevocable Trust. On remand, Alan contended that the creation and funding of these other trusts conferred a benefit on Alice that would give rise to a presumption of undue influence. The defendants filed a motion for a protective order prohibiting discovery of evidence regarding these transfers, along with a motion in limine to exclude such evidence on remand. They argued that Alan was attempting to impermissibly expand the scope of the issues on remand beyond those that were at issue in *Cartwright I*. The

12

defendants noted that Alan nonsuited all of the claims that were not resolved by the motion for partial summary judgment prior to the appeal in *Cartwright I*. Accordingly, they claimed that evidence regarding the 1996-1 and 1996-2 trusts was not relevant to the limited issues on remand -- whether *the Amendments to the ACC Grantor Trust* were procured by undue influence, and more specifically, whether the pour-over provision and cap on Alan's distributions resulted in a benefit to Alan or to Alice.

The trial court entered an order denying the defendants' motion for protective order and motion in limine but nevertheless narrowly defining the issues on remand. The trial court summarized the procedural history of the litigation, noting that the defendants' original motion for partial summary judgment addressed whether they had complied with the terms of the trusts. In response to that motion for summary judgment, Alan had advanced two basic theories: (1) Exhibit A was a fabrication; and (2) Alan signed *the amendments to the ACC Grantor Trust* as a result of undue influence. The court of appeals in *Cartwright I* reversed only with regard to the second issue. Therefore, the trial court concluded that, on remand, it must explore whether undue influence accompanied Plaintiff's signing of the first and second Amendments to the ACC Grantor Trust, and specifically, whether the Amendments' pour-over provision and cap created the potential for "more money to remain in the corpus of the ACC Grantor Trust for potential future distribution to Alice as a contingent beneficiary." *Cartwright*, 2012 WL 1997803, at *13. The trial court concluded that even though the court of appeals affirmed summary judgment on the issue of "whether Alan received the distributions to be made to him under the trust documents as written," *id.* at *11, the Amendments to the ACC Grantor Trust affecting his distributions could be voided upon a finding that they were the product of undue influence. The trial court decided to allow discovery regarding the circumstances surrounding the execution of the documents creating the 1996-2 trust,[1] concluding that such facts "may very well be relevant" to the ultimate issue of whether the second Amendment to the ACC Grantor Trust was executed as a result of undue influence, given that the documents were executed on the same date. The court concluded that the "temporal proximity" and "factual nexus" connecting the transactions warranted further inquiry and discovery. With that said, however, the trial court determined that Alan could not secure any *relief* on remand related to the other trusts. The trial court reiterated that the focus of the prior motion for partial summary judgment, and this Court's opinion in *Cartwright I*, was on whether the Amendments to the ACC Grantor Trust were procured by undue influence. Thus, the trial court narrowly defined the scope of remand as follows:

> If [Alan] proves undue influence accompanied the signing of the amendments to the ACC Grantor Trust, then those amendments may be

---

[1]Although the trial court's order only specifically mentioned the 1996-2 Trust, the parties agree that the trial court's reasoning was applicable to the 1996-1 Trust as well, by logical extension.

voided and [Alan] can establish his right to the distributive share he would have received prior to his execution of the amendments. Yet, even if those amendments are voided, including the "gift provision" in the second amendment, this does not mean that the gifts made by way of the 1996-2 Trust should be reversed. After the hearing on Defendants' motion for partial summary judgment, [Alan] voluntarily dismissed all matters not covered in this Court's order granting summary judgment. Specifically, this Court ordered that "the remaining causes of action, claims, demands, issues and matters raised in this cause by [Alan] are dismissed." . . . Given this non-suit by [Alan], there is no legal claim or demand properly before the Court by which the gifts made by [Alan] could potentially be reversed. Again, as already discussed, the only issue which was considered on appeal related to [Alan's] relief was whether he had received specified distributions under the trust documents.

(Footnote omitted.) A few months later, during the course of discovery, the trial court entered another order reconfirming the narrow issues on remand and prohibiting Alan's counsel from inquiring during depositions about matters not relevant to the potential relief on remand. Specifically, the trial court explained, "there is no need for inquiry into matters relating to the current value of assets held in trust."

In accordance with the trial court's scheduling order, Alan disclosed Z. Christopher Mercer as his expert to testify on the subject matter of damages suffered by Alan. Also in accordance with the scheduling order, the defendants disclosed Albert W. Secor and N. Gordon Thompson as their experts. The defendants filed a motion to strike the expert report submitted by Alan's expert, Mr. Mercer, and also sought to exclude him as a witness at trial. They claimed that Mercer, who was a business valuation expert, had issued an asset valuation report that had "nothing to do with the narrow issue on remand." Rather than tracing the distributable net income that was generated by the ACC Grantor Trust and pour-over trusts, the Mercer report, according to the defendants, compared the "'net appreciation' of a hypothetical portfolio" against what Mercer estimated to be the actual "net appreciation" of the family limited partnership since 1995 and calculated Alan's damages as a percentage of the theoretical "net appreciation." Using that methodology, Mercer concluded that Alan was due trust income of $12.8 million. The defendants claimed that Mercer's methodology was not supported by Tennessee law, trust accounting principles, or the previous rulings of the trial court and the court of appeals regarding the method of calculating damages on remand. Consequently, the defendants argued that Mercer's report would not "substantially assist the trier of fact to understand the evidence or to determine a fact in issue," *see* Tenn. R. Evid. 702, as the report failed to address whether the Amendments' cap and pour-over provision benefitted Alice or resulted in damage to Alan.

14

Thereafter, Alan filed a "supplemental" report of Mr. Mercer. This report was filed two months after the deadline for the submission of Alan's expert disclosures and reports. The supplemental Mercer report concluded that Alan was owed $3.6 million.

Alan filed a motion for partial summary judgment on the limited issue of whether the defendants obtained benefits associated with the formation and funding of the Alan Cook Cartwright 1996-1 Irrevocable Trust. He also filed a motion to "amend and supplement" his original pleading, which was filed in 2004, in order to add "supplemental causes of action" alleging, among other things, that the defendants used undue influence to obtain his signatures on the documents creating the 1996-1 and 1996-2 trusts.

The defendants filed a motion for summary judgment "regarding the narrow issue on remand from the Tennessee Court of Appeals," which they described as whether the Amendments to the ACC Grantor Trust, "and only those documents[,] were procured by undue influence with a benefit conferred on Alice Garner, directly or indirectly, because of the effect of the pour-over clause and the annual 'cap' on distributions." They claimed that Alan's damages, if any, should be calculated by determining the amount of net income that would have been distributed to Alan in the absence of the Amendments and comparing that figure to his actual distributions. Defendants asserted that the pour-over provision and cap did not create "more money. . . remain[ing] in the corpus of the ACC Grantor Trust for potential future distribution to Alice [Garner] as a contingent beneficiary." *Cartwright I*, 2012 WL 1997803, at * 13. Instead, according to the reports of the defendants' experts, Alan received $1,336,483 *more* in distributions between 1995 and 2011 than he would have received without the Amendments. Specifically, defendants claimed that Alan had received 100% of the net income of the trusts in addition to over a million dollars in principal distributions. Thus, the defendants argued that they had affirmatively negated essential elements of Alan's claim by showing that Alice did not receive a benefit from the execution of the Amendments, and Alan suffered no damages.[2] In support of their motion for summary judgment, the defendants submitted the report of their expert, Thompson, who is a certified public accountant, certified financial planner, and certified valuation analyst. They also submitted a written opinion from another expert, Secor, who, according to the defendants, is an attorney with experience and expertise in matters of trusts and trust administration. The defendants also submitted a statement of undisputed facts and numerous deposition transcripts and

---

[2]Alternatively, the defendants argued that Alice would not receive a legally cognizable benefit as a remote contingent beneficiary of the ACC Grantor Trust, in any event, reasoning that Alice's interest may never vest in her favor because Alan may have a wife or child at the time of his death. They also argued, alternatively, that even if the presumption of undue influence did arise, they rebutted the presumption by showing the fairness of the transaction.

affidavits.

In response to the defendants' motion for summary judgment, Alan continued to argue that Alice received a benefit by the creation and funding of the 1996-1 and 1996-2 trusts. Alan also pointed out that the report submitted by the defendants' expert, Thompson, showed three years during which the annual cap on his distributions from the trust did have the effect of reducing the amount of income that he would have received that year. In addition, Alan claimed that the Thompson report erred in its consideration of the amount paid by the ACC Grantor Trust for Alan's income taxes. Alan also claimed that a "factual dispute" existed regarding the definition of "net annual income" as that phrase was used in the various trusts.

Along with Alan's response to the defendants' motion for summary judgment, he submitted an affidavit from a certified public accountant, Mark T. Heath, who had reviewed Thompson's report and evaluated the financial implications of the 1996-2 trust, including the damage allegedly suffered by Alan due to its creation. The defendants filed a motion to strike Heath's affidavit and to exclude him as a witness at trial, due to Alan's failure to comply with the deadline contained in the scheduling order for disclosing expert witnesses and submitting expert reports. Alternatively, the defendants argued that Heath's affidavit regarding the 1996-2 trust was irrelevant given the narrow issues on remand.

The parties filed numerous additional responses and replies to the various pending motions. On June 17, 2013, the trial court denied Alan's motion to amend and supplement his original claims, finding the proposed amendment untimely, prejudicial, and futile in light of the narrow issues on remand, "namely, whether undue influence accompanied the signing of the Amendments to the ACC Grantor Trust."

On June 18, 2013, the trial court entered an order granting the defendants' motion to strike Mercer's expert report and to exclude him as a witness at trial. The court concluded that Mercer's original report employed a methodology for measuring damages that was inconsistent with the scope of the case on remand, and therefore his original report was not relevant to the measure of damages available on remand and would not substantially assist the trier of fact. The trial court concluded that this case did not necessitate the type of financial valuation analysis Mercer performed, as he conducted a hypothetical valuation of the assets held in trust, rather than tracing the distributable net income generated by the trusts. The court also found that Mercer lacked the "foundational expertise" to render the opinions regarding trust administration that were contained in his "supplemental" report. While acknowledging that Mercer was "a nationally recognized expert in the area of business/asset appraisal and valuation," the court explained that "asset appraisal and valuation" were simply "not at issue in the case

16

on remand." The court also found that Mercer's supplemental report used a definition of "net income" that was inconsistent with the applicable trust documents. The trial court rejected the notion that the term "net income" created a latent ambiguity which required the consideration of extrinsic evidence. Finally, the court concluded that Mercer should also be excluded as a witness at trial given the exclusion of his expert reports.

The trial court held a hearing on the summary judgment motions on June 19, 2013. During the hearing, in addition to arguing the issues raised in the parties' motions, Alan argued that Thompson's affidavit and report were technically deficient in that his affidavit included only a statement under oath that Thompson's firm was the source of the attached report, and it did not contain an oath that the report was correct or represented his opinion that he would give at trial. The defendants argued that the affidavit and report were sufficient, but nevertheless, they filed a supplemental affidavit the day after the hearing to correct any perceived deficiency. Alan filed a motion to strike the affidavit as untimely and argued that the motion for summary judgment should be denied because there was no sworn testimony authenticating the Thompson report at the time of the summary judgment hearing.

On July 22, 2013, the trial court entered an order denying Alan's motion for partial summary judgment regarding the 1996-1 trust and granting the defendants' motion for summary judgment. Considering the narrow issue before the court on remand, the trial court concluded that Alan was not entitled to partial summary judgment on the issue of whether he benefitted from the creation of the 1996-1 trust. "Even assuming that benefits were conferred in the sense argued by [Alan]," the court concluded that his request for relief could not be entertained because "[t]he issue of whether undue influence accompanied the formation of the 1996-1 Trust is simply outside the scope of remand." Next, the court considered the defendants' motion for summary judgment regarding whether Alice received a benefit from the execution of the Amendments to the ACC Grantor Trust. The court found that Thompson's report provided "a detailed financial accounting of the impact created by the amendments to the ACC Grantor Trust." The court found that Thompson's report specifically determined the annual income to be distributed to Alan for the years 1995 through 2011 under the Trust agreements without the Amendments and compared that sum to the reported distributions paid directly to Alan or on his behalf. The court concluded that "Thompson's accounting shows that [Alan] was not harmed by the impact of the amendments to the ACC Grantor Trust." "In fact," the court found, "Thompson's calculations indicate[d] that [Alan] received $1,336,483.00 in excess of the distributable net income for the period." While acknowledging that Alan's response to the motion for summary judgment "set forth many theories on how he was harmed by his execution of the amendments to the ACC Grantor Trust," the trial court nevertheless concluded that Alan had "not tendered any admissible evidence or opinion which contest the findings outlined by Thompson's report." The

17

court found that "no genuine dispute exists as to Thompson's basic findings, and no appropriate legal theory has been adduced to contest his ultimate conclusions." The court noted that it had previously struck the expert report and supplemental report prepared by Mercer. It also found it appropriate to strike the Heath affidavit that was submitted by Alan in response to the defendants' motion for summary judgment. The court found that the Heath affidavit addressing the financial impact of the 1996-2 trust was "simply not relevant" to the relief available on remand. The court noted that any claims Alan had regarding the 1996-1 and 1996-2 trusts were nonsuited, and "whether undue influence accompanied the signing of the 1996-1 Trust or 1996-2 Trust is not before the Court." In addition, the court concluded that Heath's affidavit should be stricken because his opinion was "clearly one of a proposed expert" and "amount[ed] to a belated expert disclosure," filed months after the deadline for disclosure of experts. However, the court found it appropriate to consider the supplemental Thompson affidavit filed one day after the summary judgment hearing because it only corrected a technical deficiency in his previous affidavit, which was easily cured, and there was "no surprise" created by the supplemental affidavit.

In conclusion, the trial court concluded that the defendants successfully negated essential elements of Alan's claim by showing, through the Thompson report, that Alan "received over a million dollars more than he would have received absent the signing of the amendments." Because Alan "produced no relevant evidence which creates a genuine issue as to the findings in Thompson's report," the trial court granted the defendants' motion for summary judgment.

Thereafter, the trial court granted in part the defendants' motion for discretionary costs, and it also granted the defendants' motion for an award of attorney's fees incurred on remand. Alan timely filed a notice of appeal.

## II. ISSUES PRESENTED

Alan's brief lists the following issues for review on appeal:

1.   Whether the trial court erred in granting Defendants' Motion for Summary Judgment and related evidentiary rulings.

2.   Whether the trial court erred in denying [Alan's] Motion for Partial Summary Judgment.

3.   Whether the trial court erred in granting Defendants' Motions for Attorneys' Fees, Expenses, and Discretionary Costs.

For the following reasons, we affirm the decision of the chancery court and remand for further proceedings.

## III. DISCUSSION

At the outset, it is necessary to identify the issues properly presented for our review in order to define the scope of our review on appeal. "'Scope of review' defines the issues that may be reviewed by an appellate court when an order or judgment has been properly appealed." *Hodge v. Craig*, 382 S.W.3d 325, 333 n.2 (Tenn. 2012). The scope of our review depends largely on whether issues have been properly raised on appeal and presented in the manner prescribed by Tennessee Rule of Appellate Procedure 27. *Id.* at 333-34. Appellants must include in their brief "a statement of the issues they desire to present to the court and an argument with respect to each of the issues presented." *Id.* at 334-35 (footnote omitted); *see* Tenn. R. App. P. 27(a)(4) (providing that briefs must contain a "statement of the issues presented for review"). "The requirement of a statement of the issues raised on appeal is no mere technicality." *Owen v. Long Tire, LLC*, No. W2011-01227-COA-R3-CV, 2011 WL 6777014, at *4 (Tenn. Ct. App. Dec. 22, 2011). In *Hodge*, the Tennessee Supreme Court emphasized the importance of properly presenting issues for review and indicated that "a properly framed issue may be the most important part of an appellate brief." *Id.* at 334 (citing Antonin Scalia & Bryan A. Garner, *Making Your Case: The Art of Persuading Judges* 83 (2008); David E. Sorkin, *Make Issue Statements Work for You*, 83 Ill. B.J. 39, 39 (Jan. 1995)). "Rather than searching for hidden questions, appellate courts prefer to know immediately what questions they are supposed to answer." *Id.* (citing Bryan A. Garner, *Garner on Language & Writing* 115 (2009); Robert L. Stern, *Appellate Practice in the United States* § 10.9, at 263 (2d ed. 1989)). "The issues should be framed as specifically as the nature of the error will permit in order to avoid any potential risk of waiver." *Id.* at 335 (citing *Fahey v. Eldridge*, 46 S.W.3d 138, 143-44 (Tenn. 2001); *State v. Williams*, 914 S.W.2d 940, 948 (Tenn. Crim. App. 1995)). "Parties should refrain from incorporating several separate and distinct errors into a single issue." *Williams*, 914 S.W.2d at 948-49 (finding an issue waived because it was "too broad in scope" and "vague and conclusory in nature"). Instead, "[a] separate issue should be presented for each error raised in the appellate court." *Id.* at 948 (citing *Leeson v. Chernau*, 734 S.W.2d 634, 637 (Tenn. Ct. App. 1987)). The Rules of Appellate Procedure "'do[] not contemplate that an appellant may submit one blanket issue as to the correctness of the judgment and thereby open the door to argument upon various issues which might affect the correctness of the judgment.'" *Id.* at 948 n.5 (quoting *Leeson*, 734 S.W.2d at 637).

"[P]roperly drafted issues will assist the writer of the appellant's brief, the writer of the appellee's brief, the panel of appellate judges who are assigned the responsibility

of addressing the issues in an opinion, and the staff of each appellate judge." *Williams*, 914 S.W.2d at 948. If an issue is not properly drafted, "[t]he attorney preparing the appellee's brief will entertain doubt as to the precise issue that is to be addressed[.]" *Id*. The appellee is entitled to fair notice of the appellate issues so as to prepare his or her response, and, more importantly, "this Court is not charged with the responsibility of scouring the appellate record for any reversible error the trial court may have committed." *Owen*, 2011 WL 6777014, at \*4. "It is not the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for him or her, and where a party fails to develop an argument in support of his or her contention or merely constructs a skeletal argument, the issue is waived." *Sneed v. Bd. of Prof'l Responsibility of Sup.Ct.*, 301 S.W.3d 603, 615 (Tenn. 2010). "The adversarial system of justice is premised on the idea that 'appellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them.'" *Malmquist v. Malmquist*, No. W2007-02373-COA-R3-CV, 2011 WL 1087206, at \*11 n.21 (Tenn. Ct. App. Mar. 25, 2011) (quoting *State v. Northern*, 262 S.W.3d 741, 767 (Tenn. 2008) (Holder, J., concurring in part and dissenting in part)). Thus, "appellate courts may properly decline to consider issues that have not been raised and briefed in accordance with the applicable rules." *Waters v. Farr*, 291 S.W.3d 873, 919 (Tenn. 2009).

The first issue listed in Alan's brief on appeal is "[w]hether the trial court erred in granting Defendants' Motion for Summary Judgment *and related evidentiary rulings*." (Emphasis added.) Alan does not specify which "evidentiary rulings" he challenges on appeal. His brief does not include a standard of review section analyzing how this Court would consider the so-called "related evidentiary rulings," nor does it mention any evidentiary rulings in its outline in the table of contents or in its summary of argument section. The trial court issued numerous rulings on remand that were, in whole or in part, adverse to Alan's position. The court entered an order denying a motion for protective order and motion in limine (but narrowly defining the scope of remand), an order on a motion for protective order for depositions (limiting questioning due to the narrow issues on remand), an order denying Alan's motion to amend and supplement his cross-claims, an order striking Mercer's expert report and supplemental expert report and excluding Mercer as a witness at trial, and an order striking the supplemental affidavit of Heath but permitting the filing of the supplemental Thompson affidavit to correct the perceived technical deficiency. It is not clear from Alan's brief which of these rulings he would deem "evidentiary" and also "related" to the motion for summary judgment.

"'Courts have consistently held that issues must be included in the Statement of Issues Presented for Review required by Tennessee Rules of Appellate Procedure 27(a)(4). An issue not included is not properly before the Court of Appeals.'" *Bunch v. Bunch*, 281 S.W.3d 406, 410 (Tenn. Ct. App. 2008) (quoting *Hawkins v. Hart*, 86 S.W.3d

20

522, 531 (Tenn. Ct. App. 2001)). This Court has, on occasion, exercised its discretion to consider issues not properly designated as such in a brief. *See, e.g.*, *Ramirez v. Bridgestone/Firestone, Inc.*, 414 S.W.3d 707, 716 (Tenn. Ct. App. 2013) (considering the appellants' "single narrow issue" that was "apparent from a reading of their brief" even though they did not include a separate section expressly listing the issue); *Irvin v. Irvin*, No. M2011-02424-COA-R3-CV, 2012 WL 5993756, at *24 n.20 (Tenn. Ct. App. Nov. 30, 2012) (finding a statement of issues "inadequate" where it vaguely alleged that there were "two errors in [the] division of the marital estate" but exercising our discretion to consider the issues because the argument section specifically identified the two alleged errors). We decline to do so in this case, which involves complex issues, reports, and rulings in the context of a 6,500-page technical record. It is not apparent from a review of Alan's 81-page brief on appeal which "related evidentiary rulings" he intends to challenge. The argument section of his brief analyzing the issue of summary judgment contains a few scattered references to evidentiary matters but no cogent argument to support reversal of the trial court's additional orders. Counsel for the defendants was apparently uncertain as to the precise issues raised on appeal as well. The defendants' brief noted Alan's vague issue regarding "evidentiary rulings" and the fact that he did not analyze the standard of review applicable to such orders, in violation of Rule 27. In an apparent abundance of caution, the defendants analyzed every ruling by the trial court that could arguably be deemed "evidentiary" and/or "related" to the motion for summary judgment. As a result, the defendants' brief spans 140 pages.

We will not engage in the same sort of analysis. It is not the role of this Court to analyze every ruling by the trial court on remand just in case the appellant intended to challenge it on appeal. "[J]udges are not like pigs, hunting for truffles" that may be buried in the record, *Flowers v. Bd. of Professional Responsibility*, 314 S.W.3d 882, 899 n.35 (Tenn. 2010) (citation omitted), or, for that matter, in the parties' briefs on appeal. *Coleman v. Coleman*, No. W2011-00585-COA-R3-CV, 2015 WL 479830, at *9 (Tenn. Ct. App. Feb. 4, 2015). Our supreme court has clearly stated that "an issue may be deemed waived when it is argued in the brief but is not designated as an issue in accordance with Tenn. R. App. P. 27(a)(4)." *Hodge*, 382 S.W.3d at 335 (citing *ABN AMRO Mortg. Grp., Inc. v. S. Sec. Fed. Credit Union*, 372 S.W.3d 121, 132 (Tenn. Ct. App. 2011); *Childress v. Union Realty Co.*, 97 S.W.3d 573, 578 (Tenn. Ct. App. 2002)). Based on our review of the issues presented in Alan's brief, it is clear that he intended to appeal the trial court's order granting summary judgment to the defendants and denying his motion for partial summary judgment, as well as the orders granting the defendants' motions for discretionary costs and attorney's fees. Alan waived any issues regarding "related evidentiary rulings" by failing to clearly and adequately designate them as issues for review on appeal in accordance with Rule 27(a)(7)(A).

### A. Denial of Alan's Motion for Partial Summary Judgment

We now turn to Alan's contention that the trial court erred in denying his motion for partial summary judgment. The motion was entitled, "Cross-Plaintiff's Motion and Memorandum for Partial Summary Judgment as to Benefits Conferred on Defendants related to the Alan Cook Cartwright 1996-1 Irrevocable Trust." Therein, Alan asked the court to "enter an order reflecting that, as a matter of law, Defendants obtained benefits associated with the formation and funding of the Alan Cook Cartwright 1996-1 Irrevocable Trust." Alan claimed that these "benefits" were sufficient to give rise to the presumption of undue influence. In response, the defendants asked the trial court to deny Alan's motion on the basis that there was no claim or demand before the trial court regarding the 1996-1 trust.

Following a hearing, the trial court entered an order denying Alan's motion for partial summary judgment. The court's order contains the following analysis with regard to this issue:

> This case is being litigated subject to the remand of the Tennessee Court of Appeals, and as the Court has already reiterated on a number of occasions, the issue to be addressed is a narrow one. As described in this Court's December 19, 2012 Order Denying Motion for Protective Order and Motion in limine:
>
> > The clear implication from the Court of Appeals' opinion is that this Court must explore whether undue influence accompanied Plaintiff's signing of the first and second amendments to the ACC Grantor Trust. Because those amendments operated to impose a cap on Plaintiff's annual distributions from the trust, "the potential [existed] for more money to remain in the corpus of the ACC Grantor Trust for potential future distribution to Alice as a contingent beneficiary. *Cartwright*, 2012 WL 1997803, at * 13. Thus, despite the fact that the Court of Appeals affirmed this Court's decision to grant partial summary judgment on the issue of "whether [Plaintiff] had received the distributions to be made to him under the trust documents as written," *id.* at *15, the amendments affecting his distributions could be voided upon a finding that they were a product of undue influence. Such is the understanding with which the Court of Appeals remanded the case.

22

The Court has been consistent in its articulation of the scope of remand, and the present Order is no different. The relief potentially available on remand is as follows: "If Plaintiff proves undue influence accompanied the signing of the amendments to the ACC Grantor Trust, then those amendments may be voided and Plaintiff can establish his right to the distributive share he would have received prior to his execution of the amendments." *Id.* at 5. The case before this Court is no more, no less.

. . . .

Cross-Plaintiff's motion for partial summary judgment focuses on the creation of the Alan Cook Cartwright 1996-1 Irrevocable Trust. Specifically, Cross-Plaintiff requests that the Court enter an order "reflecting that . . . [the] Defendants obtained benefits associated with the formation and funding of the Alan Cook Cartwright 1996-1 Irrevocable Trust." According to Cross-Plaintiff, by establishing the receipt of such benefits, a presumption of undue influence attaches, thereby shifting the burden of proof to Defendants to prove that the transactions forming the 1996-1 Trust were not "the impermissible exercise of undue influence."

Having reflected on Cross-Plaintiff's arguments, the Court does not find it appropriate to grant his motion. Even assuming that benefits were conferred in the sense argued by Cross-Plaintiff, his request for relief cannot be entertained. The issue of whether undue influence accompanied the formation of the 1996-1 Trust is simply outside the scope of remand. As is clear from the opinion of the Court of Appeals and this Court's prior orders, the focus on remand is whether undue influence accompanied the signing of the first and second amendments to the ACC Grantor Trust. As Defendants have stated, "there is no legal claim or demand properly before the Court regarding the ACC 1996-1 Trust."

. . . . By asking this Court to make a ruling with respect to the 1996-1 Trust, Cross-Plaintiff has asked this Court to adjudicate matters outside of the scope of the case on remand. The opinion of the Court of Appeals only discusses the issue of undue influence in relation to the amendments to the ACC Grantor Trust, and its analysis of that topic makes it clear that the Court of Appeals was only concerned about potential monetary benefits received by Alice Garner as a result of the cap on Cross-Plaintiff's distributions. See generally *Cartwright*, 2012 WL 1997803, at *13. The suggestion that this Court is to explore whether undue influence accompanied the formation of the 1996-1 Trust misinterprets the direction

23

provided by the Court of Appeals and the prior orders of this Court. Cross-Plaintiff's perception of the scope of remand is simply not accurate.

(Footnote and record citations omitted.) In sum, the trial court concluded that "The issue on remand is whether undue influence accompanied the signing of the amendments to the ACC Grantor Trust; whether undue influence accompanied the signing of the 1996-1 Trust or 1996-2 Trust is simply not before the Court."

On appeal, Alan argues that "[t]he presumption of invalidity arising from a confidential relationship extends to *all dealings* between persons in fiduciary and confidential relations, and includes gifts, contracts and other transactions in which the dominant party obtains a benefit from the other party." *Malek v. Gunter*, No. M2009-00059-COA-R3-CV, 2009 WL 4878613, at *7 (Tenn. Ct. App. Dec. 16, 2009) (emphasis added). We acknowledge this principle of law. However, the particular claims that remain at issue in this lawsuit do not encompass "all dealings" between Alan and the defendants. It is important to recognize the procedural history of this case. The original cross-claims filed by Alan against the defendants were very broad and encompassed a wide range of allegedly impermissible conduct and transactions, including various breaches of fiduciary duty, conflicts of interest, and self-dealing. However, Alan nonsuited all claims that were not resolved by the defendants' motion for partial summary judgment that was at issue in *Cartwright I*. The trial court's order of voluntary dismissal without prejudice stated that it dismissed the "causes of action, claims, demands, issues and matters raised in the cause" by Alan "except for the issues covered in the order granting partial summary judgment to Cross-Defendants[.]" The motion for partial summary judgment pertained to Alan's claim for breach of fiduciary duty for allegedly failing to pay him the amounts required by the trust documents.[3] Specifically, the defendants claimed that they fully complied with the terms of the trust documents and that Alan received all distributions to which he was entitled. They argued that Alan could not prove that they violated the terms of the trusts or failed to pay him what he was due under the trust documents. The defendants noted the relevant language from the Amendments to the ACC Grantor Trust agreement and submitted interrogatory responses and testimony by affidavit and deposition, which established that all required distributions had been made to Alan through the ACC Grantor Trust in accordance with the controlling trust documents. Notably, none of the documents creating the 1996-1 and 1996-2 trusts were submitted in support of the defendants' motion for partial summary judgment.

---

[3]The defendants' motion for partial summary judgment addressed other issues as well, such as whether the defendants breached their fiduciary duties by investing trust assets in the family limited partnership, whether Alan received the distributions to be made to him under the trust documents, and other issues surrounding the terms of the family limited partnership documents and the trust documents. These rulings were either affirmed in *Cartwright I* or not challenged on appeal.

24

In response to the motion for partial summary judgment, Alan submitted a three-paragraph response, which included the following argument:

> The [defendants], both directly and indirectly by employing duress and undue influence by others, knowingly and maliciously defrauded the beneficiary of these trusts, Alan Cartwright, by trickery and by deception in failing to present alleged "Exhibit A" for review and in failing to explain the practical operation and consequences of *the First Amendment(s) to the Amended and Restated Alan Cook Cartwright Grantor Trust* at the time Cartwright was urged to sign the amendments to his Grantor Trust while under economic duress and/or by creating a false "Exhibit A" at a later time, all in contravention of the fiduciary duties owed to him at those times and all subsequent times thereto. As a result, the existence and operation of the so called "Exhibit A" is void and *the First Amendment(s) are void* as being made by the Grantor being led into a clear mistake of law and fact as to the meaning and consequences of executing the signature page that day.

(Emphasis added.) In his response, Alan did not argue that any other documents creating other trusts, such as the 1996-1 and 1996-2 trusts, were void. At the hearing on the motion for partial summary judgment, Alan's attorney did briefly refer to the alleged gift created by the 1996-2 trust, and the trial judge asked for clarification, stating, "I don't recall seeing anything about it in all of this paper that I've read." Counsel for the defendants added, "this is the first time I've heard this argument." Alan's attorney then explained that "this is background" and clarified that he was "not asking Your Honor to rule on this today." He said, "I just hit that point. I want to move on. That's not why I'm here today, but that's what it says; and that's going to be a part of this case as we go down . . . to the trier." He went on to say that the partial summary judgment motion before the court "all rests on the validity of Exhibit A" to the Amendments. The trial court's order granting partial summary judgment to the defendants did not mention the 1996-1 and 1996-2 trusts, nor were they mentioned in this Court's opinion in *Cartwright I.*[4]

Reviewing the procedural posture of this case, it is clear that the order granting partial summary judgment to the defendants did not encompass any claim or issue regarding the 1996-1 and 1996-2 trusts. The order of voluntary dismissal dismissed all claims "except for the issues covered in the order granting partial summary judgment[.]" Accordingly, we agree with the trial court's conclusion that the issue before it on remand

---

[4]Alan did attempt to supplement the record in *Cartwright I* with documents pertaining to the 1996-1 and 1996-2 trusts. However, the trial court and this Court denied Alan's request because the documents were not presented to the trial court during the partial summary judgment proceedings.

was "whether undue influence accompanied the signing of the amendments to the ACC Grantor Trust," and "whether undue influence accompanied the signing of the 1996-1 Trust or 1996-2 Trust [was] simply not before the Court." We affirm the trial court's order denying Alan's motion for partial summary judgment with regard to the 1996-1 trust.

### B. Summary Judgment in favor of the Defendants

The next issue properly presented for review is whether the trial court erred in granting summary judgment to the defendants. A motion for summary judgment should be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04.

> When ascertaining whether a genuine dispute of material fact exists in a particular case, the courts must focus on (1) whether the evidence establishing the facts is admissible, (2) whether a factual dispute actually exists, and, if a factual dispute exists, (3) whether the factual dispute is material to the grounds of the summary judgment.

*Green v. Green*, 293 S.W.3d 493, 513 (Tenn. 2009).

"The party seeking the summary judgment has the burden of demonstrating that no genuine disputes of material fact exist and that it is entitled to a judgment as a matter of law." *Green*, 293 S.W.3d at 513 (citing *Martin v. Norfolk S. Ry.*, 271 S.W.3d 76, 83 (Tenn. 2008); *Amos v. Metro. Gov't of Nashville & Davidson County*, 259 S.W.3d 705, 710 (Tenn. 2008)). "The moving party may make the required showing and therefore shift the burden of production to the nonmoving party by either: (1) affirmatively negating an essential element of the nonmoving party's claim; or (2) showing that the nonmoving party cannot prove an essential element of the claim at trial." *Martin*, 271 S.W.3d at 83 (citing *Hannan v. Alltel Publ'g Co.*, 270 S.W.3d 1, 5 (Tenn. 2008)).[5] In order to negate an essential element of the claim, "the moving party must point to evidence that tends to disprove an essential factual claim made by the nonmoving party." *Id.* at 84 (citing *Blair v. W. Town Mall*, 130 S.W.3d 761, 768 (Tenn. 2004)). "If the moving party is unable to make the required showing, then its motion for summary judgment will fail." *Id.* (citing *Byrd v. Hall*, 847 S.W.2d 208, 215 (Tenn. 1993)). The resolution of a motion for summary judgment is a matter of law, which we review *de novo* with no presumption of correctness. *Id.* However, "we are required to review the

---

[5]*Hannan* applies to this case because it was originally filed in 2004.

evidence in the light most favorable to the nonmoving party and to draw all reasonable inferences favoring the nonmoving party." *Id.* (citing *Staples v. CBL Assocs., Inc.*, 15 S.W.3d 83, 89 (Tenn. 2000)).

The defendants moved for summary judgment on the issue of whether the Amendments to the ACC Grantor Trust were procured by undue influence with a benefit to Alice because of the effect of the pour-over clause and the annual cap on distributions. "In Tennessee, a presumption of undue influence arises when there is a confidential relationship followed by a transaction in which the dominant party receives a benefit from the other party." *In re Estate of Price*, 273 S.W.3d 113, 125 (Tenn. Ct. App. Mar. 24, 2008) (citing *Matlock v. Simpson*, 902 S.W.2d 384, 386 (Tenn. 1995)). The burden of proof for each of these elements rests with the party who alleges the confidential relationship. *Id.* (citing *Smith v. Smith*, 102 S.W.3d 648, 653 (Tenn. Ct. App. 2002)).

The operative terms of the ACC Grantor Trust and its Amendments bear repeating. Prior to the Amendments, the ACC Grantor Trust Agreement directed the trustee to distribute 75 percent of the "net income" of the ACC Grantor Trust to or for the benefit of Alan. The first Amendment, executed in 1995, required all amounts that would have been distributed to Alan from 15 other trusts to instead be added to the corpus of the ACC Grantor Trust and distributed subject to its terms, by which the trustee would pay Alan "(i) the lesser of $84,000 per year or one hundred percent (100%) of the net annual income of the trust in convenient installments, or otherwise, to or for the benefit of [Alan], plus (ii) such additional amount as the Trustee determines is necessary to pay the federal and state income tax of [Alan]." The second Amendment, executed in 1996, reduced the $84,000 figure to $60,000. After Alice was named co-trustee, effective January 1, 2000, she and her mother increased Alan's monthly distribution to $7000 again, but the parties never executed another amendment to reflect this change.

In their motion for summary judgment, the defendants asserted that Alan's allegation of undue influence failed as a matter of law because they affirmatively negated essential elements of his claim. The defendants argued that Alan's damages, "if any," would be demonstrated by calculating the amount of net income that would have been distributed to him in the absence of the Amendments, but was instead poured into the ACC Grantor Trust because of the Amendments. According to the defendants, the undisputed evidence showed that Alice did not benefit from the execution of the Amendments, and Alan suffered no damages from their execution. This Court in *Cartwright I* found it "reasonable to infer, for purposes of summary judgment, that because of the cap on Alan's annual distributions, there [was] the potential for more money to remain in the corpus of the ACC Grantor Trust for potential future distribution to Alice as a contingent beneficiary." *Cartwright I*, 2012 WL 1997803, at *13. However, the defendants presented expert reports from Thompson and Secor in an effort

to demonstrate that the Amendments did not actually have that effect. According to the Thompson report, the terms of the Amendments resulted in Alan receiving $1,336,483 *more* in distributions between 1995 and 2011 than he would have received without the Amendments. According to the Thompson report, rather than receiving 75 percent of the net income of the ACC Grantor Trust and his share of the net income from the other trusts, Alan received an amount equal to *all* of the cumulative net income, in addition to principal distributions in the amount of $1,014,375. Thus, the defendants claimed that Alice received no benefit from the Amendments, and Alan did not sustain any damages.[6] In addition to the expert reports from Thompson and Secor, the defendants also submitted trust documents and testimony in the form of affidavits and deposition transcripts.

Having carefully reviewed the motion for summary judgment and accompanying documents, we conclude that the defendants' motion was properly supported, as it affirmatively negated Alan's claim that he had sustained damages as a result of his execution of the Amendments to the ACC Grantor Trust. As the trial court found, Thompson's report provided "a detailed financial accounting of the impact created by the amendments to the ACC Grantor Trust," specifically comparing the annual income for the years 1995 through 2011 that would have been distributed to Alan without the amendments with the reported distributions actually paid directly to him or on his behalf pursuant to the Amendments. As the trial court observed, Thompson's report showed that Alan "was not harmed by the impact of the amendments to the ACC Grantor Trust." Alan must be able to prove that he was damaged, and "[t]he existence of damages cannot be uncertain, speculative, or remote." *Hannan*, 270 S.W.3d at 10. The defendants "point[ed] to evidence that tend[ed] to disprove an essential factual claim made by the nonmoving party," *Martin*, 271 S.W.3d at 84, disproving the existence of damages. As a result, the burden of production shifted to Alan to demonstrate that a genuine issue of material fact existed.

When faced with a properly supported motion for summary judgment, "[t]he non-moving party must then establish the existence of the essential elements of the claim." *McCarley v. West Quality Food Serv.*, 960 S.W.2d 585, 588 (Tenn. 1998).

> The nonmoving party is required to produce evidence of specific facts establishing that genuine issues of material fact exist. *McCarley*, 960 S.W.2d at 588; *Byrd*, 847 S.W.2d at 215). The nonmoving party may satisfy its burden of production by:
>
> > (1) pointing to evidence establishing material factual disputes that were over-looked or ignored by the moving party; (2)

---

[6]The defendants also presented several alternative arguments, but due to our resolution of the first issue, it is not necessary to address the alternative theories.

> rehabilitating the evidence attacked by the moving party; (3) producing additional evidence establishing the existence of a genuine issue for trial; or (4) submitting an affidavit explaining the necessity for further discovery pursuant to Tenn. R. Civ. P., Rule 56.06.
>
> *McCarley*, 960 S.W.2d at 588; *accord Byrd*, 847 S.W.2d at 215 n.6. The nonmoving party's evidence must be accepted as true, and any doubts concerning the existence of a genuine issue of material fact shall be resolved in favor of the nonmoving party. *McCarley*, 960 S.W.2d at 588).

*Martin*, 271 S.W.3d at 84.

Alan raised several arguments in response to the defendants' motion for summary judgment, which we address in turn.

### 1. The 1996 Trusts

First, Alan repeated his assertion that the defendants exerted undue influence and caused him to suffer damages in connection with the creation and funding of the 1996-1 and 1996-2 trusts. Alan argued that the Thompson report failed to appropriately consider the financial impact of the creation and funding of the 1996-1 and 1996-2 trusts in determining whether he was damaged. Alan continues to argue on appeal that the defendants received a benefit and he was damaged by the creation and funding of the 1996-1 and 1996-2 trusts. However, the trial court concluded that Alan's proposed assessment of damages based on the 1996-1 and 1996-2 trusts was "not legally viable in light of the limited issue before this Court." The court explained that Alan's attempt to base his damages on the creation of the 1996-1 and 1996-2 trusts sought relief "outside of what is available on remand." For the reasons already discussed, based on the procedural history of this case, we agree with the trial court's conclusion that Alan could not claim an entitlement to damages based on the effect of the 1996-1 and 1996-2 trusts. The only claims that remain at issue in this lawsuit are those that were covered in the original order granting partial summary judgment to the defendants, which were at issue in *Cartwright I*. Any claims regarding the creation and funding of the 1996-1 and 1996-2 trusts were voluntarily dismissed prior to the first appeal. Therefore, Alan did not create a genuine issue of material fact regarding the existence of damages in this case by pointing to the creation and funding of the 1996-1 and 1996-2 trusts.

### 2. Three Specific Years

Alan's next effort to demonstrate that he sustained damages was based on certain

29

calculations contained within the Thompson report. Alan pointed out that for the seventeen-year period that Thompson reviewed, spanning from 1995 through 2011, Thompson concluded that the Amendments to the ACC Grantor Trust did have the effect of reducing Alan's annual income during three particular years – in 1995, 1997, and 2008. However, Alan does not explain how this demonstrates an entitlement to damages, considering that he benefitted from the Amendments during the other fourteen years. Over the entire period, Thompson concluded that Alan was paid a total of $1,336,483 *more* due to his execution of the Amendments. Accordingly, Alan did not establish the existence of damages by pointing to the three isolated years in question.

### 3. Income Tax Payments

Next, Alan argued that the Thompson report incorrectly attributed the Trust's payment of his personal income tax liability as a benefit to him that was accomplished by the execution of the Amendments to the ACC Grantor Trust. The Trust paid approximately $1.7 million toward Alan's personal income tax liability in the years following the execution of the amendments. Alan claimed that Thompson erroneously assumed that the ACC Grantor Trust would not have paid his income taxes but for the Amendments. Prior to the Amendments, the trust terms did not require the trustees to pay Alan's personal tax obligation. Pursuant to the language of the Amendments, the trustee was *required* to pay Alan "(i) the lesser of $84,000 per year or one hundred percent (100%) of the net annual income of the trust in convenient installments, or otherwise, to or for the benefit of Settlor, *plus (ii) such additional amount as the Trustee determines is necessary to pay the federal and state income tax of the Settlor* (which amount may be remitted directly to such taxing authorities by the Trustee)." (Emphasis added.) "If the drafter of [an irrevocable grantor] trust wants the trustee to have the authority to distribute principal or income to the settlor to reimburse the settlor for taxes paid on the trust's income or capital gains, such a provision should be placed in the terms of the trust." Tenn. Code Ann. § 35-6-506 Official Comment.

Despite the absence of such a requirement in the pre-Amendment trust agreement, Alan suggested in his response to the motion for summary judgment that the trustees would have paid his income taxes even without the execution of the Amendments. The pre-Amendment terms of the trust authorized the trustee, "in its sole discretion," to invade the trust corpus for Alan's benefit in the event that the trustee concluded that the amounts otherwise payable to Alan were insufficient to provide for his comfortable well-being. Because of this authority, Alan contended that the trustee would have paid his income tax liability even without execution of the Amendments, and the Thompson report erroneously listed the tax payments as a benefit that he received due to the execution of the Amendments. The defendants responded by claiming that the mandatory duty to pay taxes was a direct benefit to Alan. They contended that Alan's

unsupported allegation regarding what the trustee would have done without the Amendments was nothing more than speculation, with no evidentiary basis in the record. The defendants argued that Alan's "idle speculation" was not sufficient to create a genuine issue of material fact to defeat their properly supported motion for summary judgment. We agree with the defendants on this issue. When faced with a properly supported motion for summary judgment, the nonmoving party is required to produce evidence of specific facts establishing that genuine issues of material fact exist. *Martin*, 271 S.W.3d at 84. As previously noted,

> [t]he nonmoving party may satisfy its burden of production by:
>
> > (1) pointing to evidence establishing material factual disputes that were over-looked or ignored by the moving party; (2) rehabilitating the evidence attacked by the moving party; (3) producing additional evidence establishing the existence of a genuine issue for trial; or (4) submitting an affidavit explaining the necessity for further discovery pursuant to Tenn. R. Civ. P., Rule 56.06."

*Id.* (quoting *McCarley*, 960 S.W.2d at 588; *accord Byrd*, 847 S.W.2d at 215 n.6). Alan produced no evidence in support of his assertion that the trustees would have paid his income taxes even without the duty imposed by the Amendments. He did not submit any proof that his taxes were paid in the past or point to any evidence in the record to permit a reasonable inference that the trustees would have paid his income taxes in the absence of a duty to do so. Accordingly, Alan did not meet his burden of production with his unsupported allegation that the trustee would have paid his income taxes with or without execution of the Amendments.

### 4. Meaning of "Net Income"

Finally, in response to the defendants' motion for summary judgment, Alan cited the language of the ACC Grantor Trust agreement providing that he was to receive 75 percent of the trust's "net annual income" and argued that a "factual dispute" existed regarding "which legal definition of that term is applicable to the distributions." In calculating the annual "net income" of the trusts, the Thompson report subtracted capital gains from the total income reported on the relevant tax returns in order to determine the amount of net income that was actually distributable. Alan challenged this methodology and argued that he was entitled to a share of the capital gains as well. Alan asserted that "[t]here are two legitimate definitions" of "net income," creating a latent ambiguity and an issue of fact. As the Grantor, Alan argued that his intention as to the definition should control. Alan submitted an affidavit stating that he believed that all of the trust

31

"earnings" or "profits" would be available for his own personal use and benefit, regardless of the source.  He considered "net income" to mean *all* the income of the trust.  Alan also claimed that *Black's Law Dictionary* broadly defined net income as total income from all sources minus deductions, exemptions, and other tax reductions.  The defendants, on the other hand, claimed that the meaning of the term "net income" was an issue of law that must be resolved by resort to the Tennessee Uniform Principal and Income Act, Tenn. Code Ann. § 35-6-101, *et seq.*  We agree with the defendants.

It is commonplace for fiduciaries to encounter issues regarding the allocation of receipts to principal or income.

> Almost every trustee finds that the trust terms require him to pay or apply "income" to or for a temporary beneficiary, and to distribute "principal" to one or more beneficiaries prior to or upon termination of the trust. The trustee is also required to keep records in which he credits receipts to one or another type of trust account. He faces possible liabilities if he makes an improper allocation. It thus becomes important for him to learn what items have, by court decision or statute, been treated as trust income or trust principal. He is not to be guided by definitions of economists, accountants, or tax statutes. In a general way trust *income* will be found to include the earnings, profits or product of the property in which the trust assets are invested, while the receipts which indicate merely a change in the form of the trust corpus are to be regarded as trust *principal*, but the best criterion for making decisions is the practical treatment of the topic by the courts or legislatures.

George Gleason Bogert, George Taylor Bogert, Amy Morris Hess, *The Law Of Trusts & Trustees* § 816 (2014).[7]  The Tennessee Uniform Principal and Income Act, Tenn. Code Ann. § 35-6-101, *et seq.*, specifically addresses how a fiduciary, such as a trustee, is to allocate receipts and disbursements to or between principal and income.  Tennessee Code Annotated section 35-6-103(a)(1) provides that "[i]n allocating receipts and disbursements to or between principal and income," a trustee "[s]hall administer a trust . . . in accordance with the terms of the trust . . . even if there is a different provision in this chapter."  However, "if the terms of the trust . . . do not contain a different provision or do not give the fiduciary a discretionary power of administration," then the trustee "[s]hall administer a trust . . . in accordance with this chapter."  Tenn. Code Ann. § 35-6-

---

[7]"In thirty-six states the rules applicable to the allocation of most types of receipts are laid down in either the Uniform Principal and Income Act or in the Revised Uniform Principal and Income Act." *The Law Of Trusts & Trustees* at § 816.

103(a)(3).[8]  The Act provides the following pertinent definitions:

> (4) "Income" means money or property that a fiduciary receives as current return from a principal asset. The term includes a portion of receipts from a sale, exchange, or liquidation of a principal asset, *to the extent provided in part 4 of this chapter.*
> . . . .
> (8) "Net income" means the total receipts allocated to income during an accounting period minus the disbursements made from income during the period, plus or minus transfers under this chapter to or from income during the period.

Tenn. Code Ann. § 35-6-102 (emphasis added).  Within Part Four of the Act, Tennessee Code Annotated section 35-6-404 provides that "[a] trustee shall allocate to principal . . . [m]oney or other property received from the sale, exchange, liquidation, or change in form of a principal asset, including realized profit, subject to this chapter[.]"[9]  Thus, "[i]f

---

[8]The Uniform Principal and Income Act was substantially amended and modified in 2000.  The Act, as amended, states that it applies "to every trust . . . existing on or after July 1, 2000, except as otherwise expressly provided in the . . . terms of the trust or in this act."  Tenn. Code Ann. § 35-6-602.  The original ACC Grantor Trust agreement was executed in 1978.  The result in this case would be the same under either version of the Act.  Similar to the current version of section 35-6-103, the previous version provided that the Act governed the ascertainment of income and principal and the apportionment of receipts and expenses.  Tenn. Code Ann. § 35-6-103 (1999). It further provided that "the person establishing the principal may personally direct the manner of ascertainment of income and principal and the apportionment of receipts and expenses or grant discretion to the trustee or other person to do so."  *Id.*

[9]The previous version of the Act simply defined "income" as "the return derived from principal." Tenn. Code Ann. § 35-6-102(2) (1999).

On appeal, Alan claims that section 35-6-404 is inapplicable and only applies when liquidating the assets of a trust.  He cites no authority for this assertion.  According to the headings used in the Act, Part Four addresses the allocation of receipts during the administration of a trust.  The previous version of the Act similarly provided that "[a]ll receipts of money or other property paid or delivered as the consideration for the sale or other transfer . . . of property forming a part of the principal, . . . or otherwise as a refund or replacement or change in form of principal, is deemed principal unless otherwise expressly provided in this chapter."  Tenn. Code Ann. § 35-6-104 (1999).  It provided that "[a]ny profit or loss resulting upon any change in form of principal shall inure to or fall upon principal."  *Id.*  In addition, "any distribution by a mutual fund or investment company designated by it as a capital gain distribution [was] deemed principal."  Tenn. Code Ann. § 35-6-106(a) (1999).  Dividends or money received otherwise in return for the use of principal was deemed income.  Tenn. Code Ann. § 35-6-104 (1999).

a trustee sells normally productive trust property, other than corporate stock, he should treat the net proceeds, including any capital gain, as trust principal because they are merely a substitute for, or replacement of, the property sold. They are not in any part the product or profit of that property." *The Law of Trusts & Trustees* § 822. "If the trustee owns and sells shares of stock in a corporation, one would expect that his duties with regard to the proceeds would be the same . . . . There is a mere change in the form of the trust principal, and the income beneficiary should not be entitled to any profit made on such sale." *Id.* at § 823.

Again, the terms of the trusts at issue in this case simply direct the trustee to distribute to Alan a percentage of the "net income" of the trusts. The ACC Grantor Trust did not contain a provision specifically addressing capital gains. However, the ACC Grantor Trust did provide that "[t]his instrument and all dispositions hereunder shall be governed by and interpreted in accordance with the laws of the State of Tennessee." The other trust agreements contained similar provisions providing that they were to be construed and enforced in accordance with Tennessee law. Pursuant to Tennessee Code Annotated section 35-6-404, a trustee must allocate to principal the money received "from the sale, exchange, liquidation, or change in form of a principal asset, including realized profit." This rule would apply to capital gains. [10] The trustee is bound to follow this rule "if the terms of the trust . . . do not contain a different provision." Tenn. Code Ann. § 35-6-103(a)(3). Because the terms of the trusts at issue in this case "do not contain a different provision," *id.*, the default rule in the Act applies, and the trustee must allocate capital gains to principal. As such, Alan's entitlement to a percentage of the trusts' "net annual income" did not entitle him to a share of the trusts' capital gains.

Alan's subjective belief to the contrary is not a material fact for purposes of summary judgment. We recognize that the Act defines the phrase "terms of a trust" broadly, as "the manifestation of the intent of a settlor or decedent with respect to the trust, expressed in a manner that admits of its proof in a judicial proceeding, whether by written or spoken words or by conduct." Tenn. Code Ann. § 35-6-102(12). However, this does not mean that Alan's affidavit regarding his subjective intention can be used to alter or vary the written terms of the trust. The official comment to section 35-6-102 explains that this broad definition of "terms of a trust" is meant to clarify "that the Act applies to oral trusts as well as those whose terms are expressed in written documents." According to the official comments, the statutory definition is based on the Restatement (Second) of Trusts § 4 (1959) and the Restatement (Third) of Trusts § 4 (Tent. Draft No.

---

[10]Attorney Secor explained in his expert report that a capital gain is the income tax term for the excess on the value of a principal asset over its cost basis when the asset is sold. He explained that if capital gains were allowed to be treated as income from a trust accounting standard, a trust would very quickly be depleted because the principal or basis of the trust would be subject to distribution.

1, 1996). The official comments to those sections of the Restatement make clear that the definition of "terms of a trust" includes "the manifestation of intention of the settlor *at the time of the creation of the trust*, whether expressed by written or spoken words or by conduct, *to the extent that it is expressed in a manner which admits of its proof in judicial proceedings*." Restatement (Second) of Trusts § 4 cmt. (1959) (emphasis added). "The manifestation of intention of the settlor is the external expression of his intention as distinguished from his undisclosed intention." *Id.* If a manifestation of intention is inadmissible because of the parol evidence rule or some rule of the law of evidence, it is not a term of the trust. *Id.*

Trust instruments are interpreted in a manner similar to contracts, deeds, or wills. *In re Estate of Marks*, 187 S.W.3d 21, 28 (Tenn. Ct. App. 2005). Determining the settlor's intent "may be easily done by looking to the four corners of the trust instrument." *Id.* (citing *Marks v. S. Trust Co.*, 310 S.W.2d 435, 437-38 (Tenn. 1958)). "Where words or terms having a definite legal meaning and effect are knowingly used in a written instrument, the parties will be presumed to have intended such words or terms to have their proper legal meaning and effect, in the absence of any contrary intention appearing in the instrument." *Horadam v. Stewart*, No. M2007-00046-COA-R3-CV, 2008 WL 4491744, at *7 (Tenn. Ct. App. Oct. 6, 2008) (citing 12 Am. Jur. *Contracts* § 238). Because the written trust terms in this case used the term "net income" and provided that the instrument and all dispositions should be governed by and interpreted according to Tennessee law, it is clear that the term "net income" must be interpreted in accordance with the Tennessee Uniform Principal and Income Act. Alan's subjective belief regarding the meaning of the term "net income" is not controlling, nor is the definition of "net income" for purposes of income taxation.

We also note that regardless of whether the trustees were *required* to allocate capital gains to principal pursuant to the express terms of the trust and/or the Uniform Principal and Income Act, the ACC Grantor Trust agreement authorized the trustees "[t]o allocate receipts and disbursements between income and principal of the trust, in such manner as the Trustee in its sole discretion determines, even though one or more particular allocations may be made in a manner inconsistent with what would otherwise be applicable state or other applicable jurisdictional law." Pursuant to the terms of other trusts listed on Exhibit A, the trustees were similarly authorized

> [t]o determine in their sole discretion what is income or corpus of the trust funds and to apportion and allocate all receipts, credits, disbursements, expenses and charges to income or corpus as they shall deem proper; provided that any amounts received in cash or in kind from any 'regulated investment company,' as defined in the Internal Revenue Code, which are designated in any way as capital gain dividends or as a return of capital by

such company shall be added to the corpus of the trust.

The Uniform Principal and Income Act authorizes such a grant of discretionary authority to a trustee, as it states that "[i]n allocating receipts and disbursements to or between principal and income," a trustee "[m]ay administer a trust . . . by the exercise of a discretionary power of administration given to the fiduciary by the terms of the trust . . . even if the exercise of the power produces a result different from a result required or permitted by this chapter[.]" Tenn. Code Ann. § 35-6-103(a)(2); *see also The Law of Trusts & Trustees* § 816 (recognizing that "[s]ometimes the settlor gives to the trustee the power to decide which receipts shall be credited to income and which to principal of the trust").[11]

Alan also argues on appeal that a jury should have been allowed to weigh the evidence in this case and determine the damages flowing from the alleged undue influence. Alan argues that the existence of damages was not in question and that the only issue was the extent of damages. We respectfully disagree. The Thompson report clearly indicates that Alan was not harmed by the execution of the Amendments, as he received a greater financial benefit between 1995 and 2011 than he would have under the prior language of the ACC Grantor Trust. In response to the defendants' motion for summary judgment disproving the existence of damages, Alan failed to demonstrate that damages existed. We agree with the trial court's observation that Alan "set forth many theories on how he was harmed by his execution of the amendments to the ACC Grantor Trust" but ultimately failed to tender "any admissible evidence or opinion which contest the findings outlined by Thompson's report." The court found that "no genuine dispute exists as to Thompson's basic findings, and no appropriate legal theory has been adduced to contest his ultimate conclusions." We agree with these findings and affirm the trial court's entry of summary judgment in favor of the defendants.

### C. Award of Attorney's Fees and Discretionary Costs

---

[11]Alan also raises an argument based on Tennessee Code Annotated section 35-6-505, which directs a trustee regarding how it should pay taxes required to be paid by the trustee. However, this section does not somehow entitle Alan to receive a share of capital gains.

Alan's brief on appeal also suggests that any "money received from a partnership" should have been allocated to income pursuant to Tennessee Code Annotated section 35-6-401. However, he failed to raise this argument in his response to the defendants' motion for summary judgment, and his brief does not cite any location in the record where this argument was presented to the trial court. Therefore, we have not considered it further on appeal. In considering whether the trial court erred in granting summary judgment, we look to the evidence that the parties presented to the trial court at each stage of the summary judgment proceedings in order to decide whether the parties met their burden of production and whether a genuine issue of fact existed. *See Cartwright I*, 2012 WL 1997803, at *11 n.9 (citing *Martin*, 271 S.W.3d at 84).

The only argument raised by Alan regarding the trial court's award of attorney's fees and discretionary costs is that the awards were "premature" and "should be set aside, pending final judgment." Having affirmed the trial court's entry of summary judgment in favor of the defendants and its order denying Alan's motion for partial summary judgment, the awards of attorney's fees and discretionary costs are hereby affirmed.

Although not specifically designated as an issue, the defendants have requested an award of attorney's fees on appeal. In the conclusion section of their brief, they cite the frivolous appeal statute, Tenn. Code Ann. § 27-1-122, in addition to statutory authority for an award of attorney's fees in cases involving trust administration. *See* Tenn. Code Ann. §35-15-1004. Under either statute, the determination of whether such an award is warranted on appeal is within the sound discretion of this Court. *See In re Nathaniel C.T.,* 447 S.W.3d 244, 248 (Tenn. Ct. App. 2014) (regarding frivolous appeals); *In re Estate of Goza*, No. W2013-00678-COA-R3-CV, 2014 WL 7235166, at *6 (Tenn. Ct. App. Dec. 19, 2014) (discussing the statute regarding trust administration). Exercising our discretion, we respectfully deny the defendants' request for attorney's fees on appeal.

## IV. CONCLUSION

For the aforementioned reasons, the decision of the chancery court is hereby affirmed and remanded for further proceedings. Costs of this appeal are taxed to the appellant, Alan Cartwright, and his surety, for which execution may issue if necessary.

_____
BRANDON O. GIBSON, JUDGE